**TEXACO, INC., Plaintiff,**

**and**

**State of Louisiana and Louisiana Land & Exploration Company, Intervening Plaintiffs,**

v.

**DEPARTMENT OF ENERGY and Charles W. Duncan, Jr., Secretary of Energy, Defendants.**

Civ. A. No. 79–323.

United States District Court, D. Delaware.

May 6, 1980.

---

James M. Tunnell, Jr., Andrew B. Kirkpatrick, Jr., William O. LaMotte, III, and Richard D. Allen of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Stephen H. Bard, White Plains, N. Y., for plaintiff.

David A. Anderson, of Potter, Anderson & Corroon, Wilmington, Del., James R. Patton, Jr., Allan A. Tuttle and George M. Borababy of Patton, Boggs & Blow, Washington, D. C., for intervening plaintiff State of Louisiana.

Charles F. Richards, Jr., and Stephen E. Herrmann of Richards, Layton & Finger, Wilmington, Del., John R. Cope, Thomas D. Manford, III, Roger L. Reynolds, and Daryl J. Hudson, III of Bracewell & Patterson, Washington, D. C., J. Henry Phillips, III of Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, La., for intervening plaintiff Louisiana Land & Exploration Co.

James W. Garvin, Jr., U. S. Atty., John X. Denney, Jr., Asst. U. S. Atty., Wilmington, Del., Alice Daniel, Asst. Atty. Gen., John P. McKenna, Nancy C. Crisman and Christopher M. Was, Dept. of Energy, Washington, D. C., for defendants.

## OPINION

STAPLETON, District Judge:

In this action initiated by Texaco, Inc. ("Texaco") and in which the State of Louisiana ("Louisiana") and the Louisiana Land and Exploration Company ("LL&E") have intervened, plaintiff and plaintiff-intervenors ("plaintiffs") seek declaratory relief as to the meaning and validity of certain regulations and rulings of the Department of Energy ("DOE")[1] and injunctive relief as to a currently pending DOE administrative compliance proceeding in which Texaco is charged with exceeding by more than $748,-000,000[2] authorized prices for domestically produced crude oil. Specifically, plaintiffs seek a determination that multiple producing reservoirs operated by Texaco in Louisiana and recognized by the Louisiana Office of Conservation ("LOC") as separate properties may be treated as separate properties under DOE regulations even though they may be located on a single premises. Defendants have moved to dismiss the complaint on the grounds that the plaintiffs have failed to exhaust their administrative remedies and that the issues raised are not ripe for judicial review. For the reasons set forth below, I conclude that Texaco's

---

1. For convenience, in this Opinion "DOE" will also refer, where appropriate, to the Department of Energy's predecessor agencies, including the Federal Energy Administration, Federal Energy Office, and Cost of Living Council.

2. Including interest through March 31. 1979 of nearly $140,000,000, the amount in controversy exceeds $888,000,000.

and LL&E's complaints must be dismissed and that resolution of the DOE's motion to dismiss Louisiana's complaint should be deferred. Before addressing the DOE's motions, however, I shall sketch the regulatory and factual landscape against which this controversy has arisen.[3]

## I. BACKGROUND.

### A. PARTIES.

Texaco is a Delaware corporation engaged in the business of discovering, producing, refining, and marketing crude oil and petroleum products. LL&E is a working and/or royalty interest owner in many of the oil and gas properties operated by Texaco which are involved in this litigation. Louisiana has an interest in the outcome of this litigation both as a sovereign and as a landowner. In the former capacity, it receives a severance tax based on the price at which oil and gas produced within the State are first sold or transferred; in the latter, it leases its lands to producers and receives a royalty based on the price at which oil and gas are first sold or transferred. Approximately eighty-nine percent of the dollar amount involved in the DOE compliance action represents production from Texaco's Louisiana properties.

The DOE and its Secretary are responsible, *inter alia*, for administering a price control program for domestic crude oil.

### B. APPLICABLE REGULATIONS.

Since August, 1973, domestic crude oil production has been subject to a two-tier system of federal price controls. 38 Fed. Reg. 22536 (Aug. 22, 1973); 10 C.F.R. Part 212.[4] With qualifications not relevant to the present dispute, under the controls, production designated as "old oil" has been subject to lower price ceilings while the

price of production qualifying as "new oil" has been subject to higher ceilings. The determination of whether oil is "old" or "new" is made by reference to historical and current levels of production on a "property", as that term is defined in the DOE's regulations. As the DOE has long recognized, in light of its role in the determination of whether oil is "old" or "new", "the property concept is clearly the most fundamental aspect of the two-tier pricing mechanism." 41 Fed.Reg. 4931, 4938 (Feb. 3, 1976).

"Property" was originally defined in the DOE's regulations as "the right which arises from a lease or fee interest to produce domestic crude oil." 38 Fed.Reg. 22536, 22538 (Aug. 2, 1973). The DOE remained silent as to the proper interpretation and application of the original property definition until the promulgation, in September, 1975, of Ruling 1975–15, "addressed to those cases where, due to . . . a change or restructuring [of the right to produce crude oil] since 1972, an interpretation of the definition of 'property' is required for proper application of the price rules. . . ." 40 Fed.Reg. 40832 (Sept. 4, 1975). Ruling 1975–15 dealt, *inter alia*, with *"Production From More Than One Reservoir on a Single Property"*, and stated the following:

> Because the property concept is based upon the right to produce crude oil, whether arising from a lease or from a fee interest, the *existence of two or more separate and distinct reservoirs will not in itself create two or more separate "properties"*. Therefore . . . where a producer holds a single right to produce crude oil from two or more reservoirs, together the two or more reservoirs constitute a single property; where there

---

3. Throughout the background discussion which follows, it is to be rememberd that in the context of a motion to dismiss all factual disputes must be resolved in favor of the plaintiffs.

4. The regulations according to which the DOE has administered price controls over domestic crude oil have been issued pursuant to authority conferred by the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note (1979 Supp.);

the Trans-Alaska Pipeline Authorization Act, Pub.L. 93–153, 87 Stat. 576 (1973); the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. §§ 751, *et seq.* (1976 & 1979 Supp.); the Energy Policy and Conservation Act, 42 U.S.C. §§ 6201, *et seq.* (1977 & 1979 Supp.); and the Department of Energy Organization Act, 42 U.S.C. §§ 7101 *et seq.* (1977).

are separate and distinct rights to produce crude oil from each reservoir, each reservoir accordingly represents a different property.

*Id.* at 40833 (emphasis added).

The DOE addressed the property concept on several occasions during the year following promulgation of Ruling 1975–15. *See* 41 Fed.Reg. 1564 (Jan. 8, 1976); 41 Fed. Reg. 4931 (Feb. 3, 1976); 41 Fed.Reg. 16179 (Apr. 16, 1976); 41 Fed.Reg. 36172 (Aug. 26, 1976). "The most complex and apparently controversial issue", 41 Fed.Reg. 36172, 36177 (Aug. 26, 1976), which continued to confront the agency was whether discrete producing reservoirs located on a single premises should, for that reason alone, be treated as separate properties. In January of 1976, the DOE proposed for comment a new property definition which "would define as the property, the right to produce crude oil from a reservoir, whether arising from a lease or from a fee interest. *The amended definition, if adopted, would recognize the existence of separate properties on one lease, where the lease encompasses separate and distinct producing reservoirs.*" 41 Fed.Reg. 1564, 1571 (Jan. 8, 1976) (emphasis added). The DOE again addressed, albeit indirectly, whether such reservoirs should be treated as multiple properties in a proposed rulemaking issued in April. 41 Fed.Reg. 16179, 16180 (Apr. 16, 1976). In a discussion of state-recognized productive units the DOE stated generally that "the right to produce crude oil may be described in the first instance by a lease or fee interest, but is subject to the possible further modification if some other producing entity has been recognized by the applicable state authority, which describes a different right to produce." *Id.* The DOE then specifically addressed productive units recognized by Louisiana, stating:

> For example, in Louisiana, where unitization may be compelled by the Commissioner of Conservation, the recognition by

the state of producing entities is generally based upon factors other than merely surface boundaries. Such productive entities are called "units", although the term does not always denote the combination of separate lease or fee interests into the type of "unitization" described in Ruling 1975–15. It may, instead indicate the recognition of the geological limits of a producing *reservoir* which lies entirely within the surface boundaries of a single lease. Such units may be formed in Louisiana as a result of a formal proceeding, and they then become separate producing entities recognized by the state. The balance of production from the non-unitized portion of the lease is then also recognized by the state as a producing entity. Accordingly, *in Louisiana each state-recognized unit may therefore appropriately describe a property, with each lease upon which is reported non-unitized production also appropriately describing a separate property.*

*Id.* (emphasis added). However, the agency ultimately declined to adopt the regulatory changes proposed in January and April. *See* 41 Fed.Reg. 4931 (Feb. 3, 1976); 41 Fed.Reg. 36172 (Aug. 26, 1976).

Until the DOE issued "Clarifications to Mandatory Petroleum Price Regulations Applicable to Domestic Crude Oil" on August 20, 1976, 41 Fed.Reg. 36172 (Aug. 26, 1976), then, the regulatory definition of property promulgated in 1973 remained substantially unchanged,[5] and Ruling 1975–15 represented the only interpretation of that definition adopted by the DOE. In the August 20 notice, the DOE adopted a prospective amendment of the property definition, effective September 1, 1976. The amended definition provided as follows:

> "Property" means the right to produce domestic crude oil, which arises from a lease or from a fee interest. A producer may treat as a separate property each separate and distinct producing reservoir

5. The wording of the definition was changed slightly effective February 1, 1976. As so amended the definition read as follows: " 'Property' means the right to produce domestic crude oil, which arises from a lease or from a fee interest." 41 Fed.Reg. 4931, 4940 (Feb. 3, 1976). As the DOE subsequently acknowledged, however, the definition remained substantively unchanged. 41 Fed.Reg. 16179 (Apr. 16, 1976).

subject to the same right to produce crude oil, provided that such reservoir is recognized by the appropriate governmental regulatory authority as a producing formation that is separate and distinct from, and not in communication with, any other producing formation.

*Id.* at 31684. The DOE explained the addition of a second sentence to the definition of property as an attempt to accommodate commentators who favored reservoir-by-reservoir property designations while at the same time reducing the difficulty of administering and monitoring a system allowing for non-uniform property designations. "This problem", it recognized, "would be minimized if [DOE] would defer to other expert agencies to make reservoir-by-reservoir determinations." *Id.* at 36179. The DOE emphasized, however, that it did not intend to alter the basic thrust of the original property definition by adding the second sentence. *See* 42 Fed.Reg. 4409, 4410 (Jan. 25, 1977).

In addition to adopting a prospective amendment of the property definition in the August 20, 1976 notice, the DOE also issued "clarifications" of the definition having retroactive effect. The agency concluded that, as originally adopted, "the term 'property' was intended to refer to the premises described in the oil and gas lease", 41 Fed.Reg. 36172, 36174 (Aug. 26, 1976), and, therefore, that reservoir-by-reservoir property designations were not contemplated. The DOE concluded that the issue was not "unambiguous", however; that "producers had no detailed guidance initially"; "that there have, in fact, been many differing interpretations of the meaning of the term among producers"; and that, accordingly, "an interpretation of the term property that was limited to the literal meaning of the language of the definition would be inequitable." *Id.* at 36174, 36175.

In light of these considerations, the DOE adopted five clarifications of relevance to the present controversy. The agency initially addressed situations in which a single instrument created more than one right to produce and, accordingly, more than one property:

Generally speaking, where the rights or duties created under a single instrument are significantly different with respect to particular identified portions of a described premises, where a producer has in good faith relied upon such differences in its exploration and development activities, and where the producer has consistently and historically accounted for such portions separately, [DOE] will permit the lease concerned to be considered as having established more than a single "right to produce" and, consequently, more than a single property.

*Id.* at 36176. The DOE next addressed four circumstances under which producers could treat premises subject to a single right to produce as multiple properties. Such treatment was permissible, first, for fee and certain large lease interests on which were located non-contiguous tracts where "such non-contiguous tracts were developed and produced separately, and where they have historically and consistently been accounted for as separate properties". *Id.* at 36176–36177. Such treatment was also condoned for "very large tracts" on which "separate geological formations . . . have been developed and produced separately, and which have historically and consistently been accounted for separately". *Id.* Third, the DOE stated that where less than an entire premises had been unitized or otherwise aggregated with premises subject to other rights to produce, the producer was permitted to consider the non-unitized portion of the premises as a separate property. *Id.* Finally, the DOE determined that it was appropriate for producers to treat a single tract as multiple properties "where the production from identifiable portions of the premises is required to be measured and accounted for separately for purposes of determining severance tax liability or for purposes of accounting to royalty owners . . . and where such a [*sic*] portions of the premises have consistently and historically been treated as separate properties". *Id.* Though willing to adopt these retroactive interpretative modifications, however, the DOE expressly refused to sanction the

treatment as separate properties of reservoirs *qua* reservoirs located on a single premises. *Id.*

The clarifications contained in the August 20, 1976 notice were repeated nearly verbatim in the form of Ruling 1977–1 several months later. 42 Fed.Reg. 3628 (Jan. 19, 1977). Less than one week thereafter, the DOE issued Ruling 1977–2, 42 Fed.Reg. 4409 (Jan. 25, 1977), for the purported purpose of resolving issues left open by the August 20, 1976 release. In addition to clarifying the property definition which had been prospectively amended effective September 1, the DOE attempted to clarify the retroactive clarifications to the 1973 definition. In the latter connection, the Ruling provided *inter alia*, that producers which had made property designations which were consistent with the clarifications contained in the August 20 notice and Ruling 1977–1 would be permitted to continue to use such designations after September 1, 1976. *Id.* at 4410. Additionally, the DOE reiterated its conclusion that producers were never justified in treating a single premises as multiple properties simply because of the existence of more than one reservoir thereon.[6] Lastly, the DOE arguably added a requirement for producers operating on premises with more than one reservoir seeking to qualify for inclusion under the August 20 clarifications. It stated, "[DOE] will not permit, before September 1, 1976, the treatment of separate reservoirs as sep- arate properties *except in those cases where such treatment was permitted by express [DOE] order or interpretation as indicated in Ruling 1977–1.* *Id.* at 4411 (emphasis added).

## C. FACTS.

Louisiana, through the LOC, extensively regulates the production of oil and gas within its boundaries. The Commissioner of the LOC is empowered, *inter alia*, to prevent wells from being drilled, operated, and produced so as to cause injury to neighboring property; to regulate the manner of drilling, casing, and plugging of wells; to regulate secondary recovery methods, to limit and prorate the production of oil and gas from pools or fields; to regulate the spacing of wells, and to require reports with respect to location, drilling, and production. A statute enacted in 1940 directed the Commissioner to establish "a drilling unit or units for each pool . . . [f]or the prevention of waste and to avoid the drilling of unnecessary wells." The statute defined a "pool" as a reservoir.

The LOC has continued to regulate production, in many instances, on the basis of production units the limits of which are determined by the limits of oil and gas reservoirs rather than by the boundaries of the lease or fee interests on which the reservoirs are located. Such units include reservoir-wide sand units, proration units,[7] 29(F) reservoir units, voluntary units, and attic voluntary units. Louisiana law re-

---

**6.** This clarification was necessitated by an ambiguity introduced by the August 20, 1976 notice and partially resolved by Ruling 1977–1. In the notice of August 20, 1976, the DOE equated "reservoirs" with "geological formations": "Crude oil which can be commercially produced generally must be found in underground reservoirs—geological formations which have trapped a sufficient quantity of marketable crude oil to make production economically feasible." 41 Fed.Reg. 36172 (Aug. 26, 1976). Later in the same notice, in the discussion of "very large tracts", the DOE stated the following: "Separate geological formations subject to the same right to produce which have been developed and produced separately, and which have historically and consistently been accounted for separately may continue to be so regarded." *Id.* at 36177. These provisions might have been construed to per- mit at least those producers operating on very large tracts with more than one reservoir to treat the premises as multiple properties. In Ruling 1977–1, the DOE sought to prevent such a reading by deleting the reference to geological formations in its discussion of production from underground reservoirs. 42 Fed.Reg. 3628, 3629 n. 2 (Jan. 19, 1977). In Ruling 1977–2, it clarified its position further, stating explicitly that the term "geological formation" in the discussion of very large tracts in the August 20 notice and Ruling 1977–1 referred not to an individual reservoir but to several reservoirs generally having common characteristics. 42 Fed.Reg. 4409, 4411 (Jan. 25, 1977).

**7.** In November, 1976, the Commissioner of the LOC abolished proration reservoirs effective June 1, 1977.

quires accounting for and payment of severance taxes, as well as payment of royalties from production on lands leased by the state which comprise state-recognized units, on a unit-wide basis, regardless of lease boundaries.

Since price controls were first imposed on domestic crude oil in 1973, Texaco has, in nearly all instances, designated production units recognized by the LOC as separate properties, and has designated production as "old oil" or "new oil" on that basis. DOE compliance personnel first took issue with Texaco's application of the property definition in an "Issue Letter" dated December 29, 1975. In August, 1977, an audit of Texaco was begun. On December 12, 1977, the DOE issued a "Fact Statement" which asserted that Texaco's property determinations were "in violation of the definition of property in 10 C.F.R. Section 212 and Rulings 1975–15, 1977–1, and 1977–2." On January 25, 1978, a, DOE enforcement office issued a "Notice of Probable Violation" ("NOPV") to Texaco to which Texaco responded on March 22, 1978, denying that its application of the regulatory definition of property was improper. On May 1, 1979, the same office issued a "Proposed Remedial Order" ("PRO") which directed Texaco to pay more than $888,000,000 to the United States Treasury and to take certain other actions for having violated the pricing regulations by employing unacceptable property designations. The NOPV and PRO were based on DOE audits of certain of Texaco's properties for the period from September of 1973 through December of 1976, and extrapolation from the results thereof based on the DOE's "natural presumption" that its audit findings could be generalized to include unaudited properties and time periods.

DOE regulations contemplate a four-stage adjudicative enforcement procedure. The enforcement process is generally initiated by the issuance of a NOPV when the DOE's Economic Regulatory Administration ("ERA") "has reason to believe that a violation [of the pricing regulations] has occurred, is continuing or is about to occur." 10 C.F.R. § 205.191(a).[8] If the ERA determines that a violation of the pricing regulations has occurred, is occurring, or is about to occur, the process moves to its second step with the issuance of a PRO. 10 C.F.R. § 205.192(a). If the PRO is not contested, the ERA may request the Office of Hearings and Appeals ("OHA") to issue the PRO as a final Remedial Order ("RO"). 10 C.F.R. § 205.193(e). If, however, the PRO is contested, the enforcement process proceeds to its third stage, an adversary, adjudicatory hearing before the OHA. 10 C.F.R. § 205.193. At the conclusion of proceedings before the OHA that office may issue a RO. 10 C.F.R. § 205.199B(a). A RO may be appealed, in the fourth and final step of the administrative enforcement process, to the Federal Energy Regulatory Commission ("FERC"), 10 C.F.R. § 205.-199C, which may affirm, modify, or vacate the RO.

## II. ANALYSIS.

The issues plaintiffs seek to have resolved in this action are set forth in paragraphs 37 and 38 of Texaco's complaint:

37. The first such issue is whether state recognized production units in Louisiana corresponding to separate oil and gas reservoirs and governing Texaco's right to produce could and can be designated as separate properties under the regulations.

\*　　\*　　\*　　\*　　\*　　\*

38. The second such issue is whether overcharge claims can be made strictly on an extrapolation basis as to properties and time periods with respect to which DOE has made no analysis and has no evidence.[9]

---

8. The NOPV issued to Texaco on January 24, 1978 was issued by the Office of Special Counsel ("OSC") of the ERA which is responsible for enforcement of the pricing regulations with respect to major oil refining companies.

9. Louisiana does not challenge the use of the extrapolation technique.

With respect to the first issue plaintiffs assert that in the period prior to the 1976 amendment of the property definition Texaco designated LOC units as separate properties in the belief that they represented separate rights to produce.[10] If such designations were appropriate in the pre-September 1976 period, they contend, they must remain appropriate today in light of the DOE's representation that the 1976 amendments, Rulings 1975–15, 1977–1, and 1977–2 were not intended to alter the basic thrust of the original property definition. To the extent that DOE regulatory pronouncements may be read to prohibit the designation as separate properties of Texaco's LOC units, either for the earlier or for the later period, plaintiffs assert that they are invalid for a variety of reasons. With respect to the second issue, they maintain that the use made of the extrapolation device by the OSC in the NOVP and PRO violates their due process rights. The DOE contends that I should refuse to entertain either of these issues at the present time because plaintiffs have failed to exhaust their administrative remedies, because the issues tendered for resolution are not ripe for judicial review, and because plaintiffs have failed to demonstrate that this case should be excepted from normal exhaustion and ripeness requirements.

## A. *PROPERTY DESIGNATION ISSUE.*

### 1. *Exhaustion.*

. The DOE characterizes plaintiffs' institution of this action as an impermissible attempt to obtain a judicial determination of the validity of theories advanced by the OSC in the agency compliance proceedings now pending against Texaco. It contends that this attempt is improper because plaintiffs have failed to satisfy statutorily imposed or judicially crafted exhaustion requirements. Plaintiffs counter that the gravamen of this action is not an attack on mere theories advanced by the OSC in the compliance proceeding, but a challenge to the DOE regulations and interpretations upon which that proceeding is based. Accordingly, they assert, the statutory requirement that administrative remedies be exhausted before judicial review of a RO may be obtained is inapplicable. They further argue that this action falls within an exception to the judicially constructed exhaustion doctrine because their claims that the regulations at issue are invalid will not be addressed by the DOE at any stage of the pending compliance proceeding.

In the view of the DOE, Section 503 of the Department of Energy Organization Act ("DOEA"), 42 U.S.C. § 7193 (1978 Pamphlet), relevant legislative history, and DOE regulations, all preclude judicial review of a RO prior to rejection of an administrative appeal by the FERC. Section 503(c) of the DOEA states that the decision of the FERC affirming, modifying, or vacating a RO "shall, for the purpose of judicial review, constitute a final agency action."[11] The Conference Report makes

---

**10.** They argue that the correctness of their belief has been confirmed by *Grisby v. Department of Energy*, 585 F.2d 1069, *modified on rehearing*, 585 F.2d 1080 (Em.App., 1978), in which the Temporary Emergency Court of Appeals stated:

> The focus of the "property" definition is upon the "right to produce" not the fee or leasehold nature of the ownership interest.
>
> * * * * * *
>
> The "right to produce" arises from a combination of sources, including, but not limited to, the nature of the ownership interest, contractual extension or restriction of ownership interest, and orders of state regulatory agencies. . . . Although the fee or leasehold interest may be the origin of the "right to produce," such a "right to produce" is con-

trolled, limited, or extended by contractual agreement and state authorities.

*Id.* at 1083.

**11.** Section 503(c) provides as follows:

> If within thirty days after the receipt of the remedial order issued by the Secretary [of Energy], the person [determined by the Secretary to have violated a regulation, rule or order] notifies the Secretary that he intends to contest a remedial order issued under subsection (a) of this section, the Secretary shall immediately advise the [Federal Energy Regulatory] Commission of such notification. Upon such notice, the Commission shall stay the effect of the remedial order, unless the Commission finds the public interest requires immediate compliance with such remedial order. The Commission shall, upon request,

884

clear Congress's intent to foreclose judicial review of a RO prior to FERC action: *"Following* action by the Commission on the appeal the decision will be reviewable as a final agency action in federal court in accordance with preexisting law." H.Conf. Rep. 95–539, 95th Cong., 1st Sess., *reprinted in* [1977] U.S.Code Cong. & Admin.News, pp. 925, 956 (emphasis added). DOE regulations are of similar effect, indicating that appeal of a RO to the FERC is a prerequisite to exhaustion of administrative remedies. 10 C.F.R. § 205.199C(e).[12] In this connection, the DOE relies heavily on *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), in which the Supreme Court stated that where a "final decision" of an agency is a statutorily specified jurisdictional prerequisite, a court cannot dispense with it on grounds of futility, as it may with the judicially developed exhaustion requirement.

The Supreme Court's opinion in *Salfi* does not support the DOE's position that, under the DOEA, agency action is not judicially reviewable until the FERC has ruled on an appeal of a RO. The plaintiffs in *Salfi* sought declaratory and injunctive relief with respect to the constitutionality of pro-

visions of the Social Security Act. Sections 405(g) and (h) of the Act, 42 U.S.C. § 405 (1970 and Supp. III), precluded judicial review of the decisions made under the challenged provisions until after the rendering of a "final decision" by the Secretary of Health, Education and Welfare.[13] Section 405(h) also barred district courts from asserting federal question jurisdiction over actions to recover Social Security benefits.[14] Thus, the Act not only conditioned the availability of judicial review under Section 405(g) on the issuance of a final decision by the Secretary, but also foreclosed all other bases of federal jurisdiction under Section 405(h).

■ It may well be that Section 503(c) of the DOEA conditions the availability of judicial review of a RO on the issuance of a final decision by the FERC. Unlike the Social Security Act, however, the DOEA has no provision restricting federal jurisdiction to review of this kind of "final decision" as opposed to other forms of final agency action. To the extent, then, that plaintiffs challenge DOE actions other than the prosecution of an agency compliance proceeding, the exhaustion requirement set forth in Section 503(c) is inapplicable and,

afford an opportunity for a hearing, including, at a minimum, the submission of briefs, oral or documentary evidence, and oral arguments. To the extent that the Commission in its discretion determines that such is required for a full and true disclosure of the facts, the Commission shall afford the right of cross examination. The Commission shall thereafter issue an order, based on findings of fact, affirming, modifying, or vacating the Secretary's remedial order, or directing other appropriate relief, and such order shall, for the purpose of judicial review, constitute a final agency action, except that enforcement and other judicial review of such action shall be the responsibility of the Secretary.

12. 10 C.F.R. § 205.199C(e) states, in part, "In order to exhaust administrative remedies, a person who is entitled to appeal a Remedial Order issued by the Office of Hearings and Appeals *must file a timely appeal and await a* decision on the merits."

13. The first sentence of Section 405(g) provided as follows:

Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in

controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow.

The second sentence of Section 405(h) stated, "No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided."

14. This prohibition was contained in the third sentence of Section 405(h), which stated, "No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 41 of Title 28 to recover on any claim arising under this subchapter." As the Supreme Court noted, "At the time § 405(h) was enacted, and prior to the 1948 recodification of Title 28, § 41 contained all of that title's grants of jurisdiction to United States district courts, save for several special-purpose jurisdictional grants of no relevance to the constitutionality of Social Security statutes." *Weinberger v. Salfi, supra,* 422 U.S. at 756 n. 3, 95 S.Ct. at 2462.

accordingly, does not bar review at this time. *See Johnson v. Robison*, 415 U.S. 361, 367–368, 94 S.Ct. 1160, 1165–1166, 39 L.Ed.2d 389 (1974); *Weinberger v. Salfi, supra*, 422 U.S. at 761–762, 95 S.Ct. at 2464–2465.

■ It is my understanding that plaintiffs primarily seek not review of the agency's enforcement proceeding currently pending against Texaco, but rather extra-enforcement review of the DOE regulatory pronouncements upon which the enforcement proceeding is concededly predicated, Rulings 1975–15, 1977–1, and 1977–2, as well as the notice issued August 20, 1976. The complaints are not unambiguous on this score. Each discusses the ongoing DOE compliance action against Texaco. In addition, each contains language to the effect that the "DOE has adopted, and has instituted an enforcement and compliance proceeding based on, the position that [a specified DOE regulatory pronouncement] prohibits" the designation as separate properties of production units recognized by the LOC, allowing the inference that the theories asserted by the OSC in the compliance proceeding actually are at issue. I decline to draw that inference, however. While the complaints may be ambiguous, it is unmistakable from plaintiff's briefs and representations at oral argument that their quarrel is with the regulations rather than the compliance proceeding.[15] Because the statutory exhaustion requirement contained in Section 503(c) does not apply to such challenges and because nothing else in the DOEA purports to preclude them, I conclude that Section 503(c), in and of itself, does not foreclose plaintiffs from maintaining this action at this time.

Independent of the statutory exhaustion requirement contained in Section 503(c), the DOE contends that general exhaustion considerations preclude plaintiffs from obtaining a judicial determination of their claims at the present time. It argues that judicial intervention will be unnecessary should Texaco prevail in the agency proceeding; that, in any event, the Court will benefit from the agency's articulation of its enforcement rationale, and that the application of DOE regulations to Texaco's properties will require factual inquiries and analyses for which the agency's expertise makes it better suited than this Court.

This Court has examined the exhaustion doctrine in a number of prior decisions in actions against the DOE. *See Pennzoil Co. v. Department of Energy*, 466 F.Supp. 238 (D.Del.1979); *Northern Natural Gas Co. v. Department of Energy*, 464 F.Supp. 1145 (D.Del.1979); *Phillips Petroleum Co. v. Federal Energy Administration*, 435 F.Supp. 1239 (D.Del.1977), *aff'd. sub nom. Standard Oil Co. v. Department of Energy*, 596 F.2d 1029 (Em.App.1978). The exhaustion requirement provides "that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938). In *Phillips Petroleum Co. v. Federal Energy Administration, supra*, 435 F.Supp. at 1248, Chief Judge Latchum outlined the purposes of the doctrine as follows:

> (1) to permit the administrative agency to bring its expertise to bear when technical considerations are involved in the resolution of issues, (2) to permit the agency to develop a full factual record

---

**15.** For example, at oral argument Mr. Kirkpatrick, counsel for Texaco, discussed what constituted the "final agency action" with which Texaco took issue:

> I say, your Honor, that is the ruling of August 20, 1976, republished in January of the following year as Ruling 1977–1. There are repetitions and perhaps you could say elaborations a few weeks later in early 1977 in Ruling 77–2. I think lawyers would argue about whether 77–2 really adds anything or not.

> But that, your Honor, is the ruling. It is a ruling four square against us on our basic position that under the first sentence of the "property" definition, which was the only sentence prior to 1976, we could designate state production units as properties for pricing purposes.
> So that is the agency action, and, your Honor, it is final I think in every sense that courts have used that word.

Tr. of Oral Arg. at 38–39.

where such facts would be useful to the Court in resolving the issues, and (3) to assure that governmental resources are used efficiently . . . .

*See also Parisi v. Davidson*, 405 U.S. 34, 37, 92 S.Ct. 815, 817, 31 L.Ed.2d 17 (1972); *McKart v. United States*, 395 U.S. 185, 193–195, 89 S.Ct. 1657, 1662–1663, 23 L.Ed.2d 194 (1969).

■ As the Supreme Court noted in *McKart*, the exhaustion doctrine "is, like most judicial doctrines, subject to numerous exceptions." *Id.* at 193, 89 S.Ct. at 1662. *See also Bendure v. United States*, 544 F.2d 427, 431 (Ct.Cl.1977); *Committee for G. I. Rights v. Callaway*, 518 F.2d 466, 474 (D.C. Cir. 1975). Exhaustion of administrative remedies may not be required, for example, where the agency remedy is inadequate, where the agency action will cause irreparable injury, where the agency has acted in excess of its statutory authority, and where pursuit of an administrative remedy would be futile. 5 B. Mezines, *et al.*, Administrative Law § 49.02 (1978 and 1979 Supp.). Thus, where the issues sought to be litigated are purely legal and where the agency has either taken a final position with respect to such issues or will not address them even if administrative remedies are exhausted, exhaustion has not been mandated. *See, e. g., Pennzoil v. Department of Energy, supra*, 466 F.Supp. at 243–244; *Phillips Petroleum Co. v. Federal Energy Administration, supra*, 435 F.Supp. at 1248.

■ Again, therefore, it becomes necessary to identify the issues plaintiffs seek to litigate in this action. If, as defendants allege, they merely seek judicial review of theories advanced by the OSC in the agency compliance proceeding, exhaustion would in all likelihood be required for all the reasons suggested by the DOE. As I have already observed, however, I believe that what plaintiffs actually seek is a determination of the validity of certain DOE regulatory pronouncements and an injunction restraining the DOE from enforcing those of its regulations found to be invalid.[16] The DOE has not suggested that it could grant this or comparable relief if plaintiffs were required to exhaust their administrative remedies. Neither the DOEA nor the relevant regulations indicate that the DOE will consider the validity of the challenged regulations at a subsequent stage of the compliance process.[17] Moreover, the compliance proceeding cannot alleviate the hardship of which Louisiana complains arising from the property designations and pricing decisions of other Louisiana producers. Finally, I think it apparent that the resolution of the legal issues raised by plaintiffs does not fall within the special competence of the DOE or require further development of a factual record. Accordingly, since the Court would not violate the policies underlying the exhaustion requirements by entertaining plaintiffs' legal claims at the present time, I conclude that plaintiffs should not be barred from maintaining this action for that reason.

2. *Ripeness.*

The DOE maintains, nonetheless, that this Court should refuse to entertain this action because it is not yet ripe for judicial review. Like its contention that plaintiffs have failed to exhaust their administrative remedies, the DOE'S position that this action is not ripe for judicial review is premised primarily on the mistaken assumption that plaintiffs seek nothing more than to litigate the theories advocated by the OSC in the pending agency compliance proceeding against Texaco. Those theories are not ripe for review, it asserts, because they do not represent final agency action,

16. They do not, for example, ask this Court to determine whether any property involved in the RO proceeding does or does not violate Rulings 1975–15, 1977–1, and 1977–2, even though they take that position in the agency proceeding. Nor do they ask this Court to determine any legal issue posed in the RO proceeding as to which the defendants have not taken a position in a prior ruling.

17. At oral argument counsel for the DOE conceded that the OHA would be bound to treat the challenged regulations as valid and took no position as to the FERC's authority to disregard them or to find them to be invalid. Tr of Oral Arg. at 118.

because their application to units recognized by the LOC will require detailed factual analysis, and because in and of themselves they cause plaintiffs no hardship. Even if plaintiffs actually seek to challenge the regulations on which the compliance proceeding is based, rather than the compliance proceeding itself, the DOE argues that the action is not ripe because plaintiffs have failed to show that the challenged regulations, which apply to the period prior to September 1, 1976, cause it any continuing hardship such as an ongoing pricing dilemma. Finally, the DOE asserts that this action cannot be ripe until the DOE determines or plaintiffs concede that Texaco is in violation of the challenged regulations.

■ The basic purposes served by the ripeness doctrine are similar to those served by the exhaustion doctrine. *See, e. g., Phillips Petroleum Co. v. Federal Energy Administration, supra*, 435 F.Supp. at 1248; *Standard Oil Co. v. Federal Energy Administration*, 440 F.Supp. 328, 370–371 (D.Ohio 1977), *aff'd. sub. nom. Standard Oil Co. v. Department of Energy, supra*, 596 F.2d 1029. The object of both doctrines is to prevent courts from becoming involved in administrative disputes which call for detailed factual analysis or technical expertise and which do not yet cause or threaten any concrete hardship. The Supreme Court addressed the requirements of the ripeness doctrine in the pre-enforcement review context[18] in the *Abbott Laboratories* trilogy. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Toilet Goods Association v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); *Gardner v. Toilet Goods Association*, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). As Chief Judge Latchum stated in the *Phillips Petroleum* case, under the *Abbott Laboratories* trilogy,

> a controversy is ripe for pre-enforcement judicial relief if an affirmative answer can be given to the following four questions: (1) are the issues presented purely

legal, (2) are the issues based on final agency action, (3) does the controversy have a direct and immediate impact on the plaintiffs' businesses, and (4) is the litigation calculated to expedite final resolution rather than delay or impede effective agency enforcement?

*Phillips Petroleum Co. v. Federal Energy Administration, supra*, 435 F.Supp. at 1245.

Were plaintiffs seeking no more than relief from the ongoing DOE compliance proceeding, I would have little trouble agreeing with the DOE that the controversy would be unripe for judicial review. *See, e. g., Southwest States Marketing Corp. v. Department of Energy*, C.A. 1–79–54 (N.D. Tex., Jan. 29, 1980). If such were the nature of plaintiffs' challenge, it would appear, the agency action at issue would be interlocutory rather than final, the challenge would call for resolution of factual as well as legal issues, the challenged action would inflict no concrete hardship on plaintiffs, and entertainment of the challenge would not advance final resolution of the administrative proceeding. As has already been stated, however, plaintiffs seek in this action to challenge not the compliance proceeding but the regulatory pronouncements on which that proceeding is based. A determination of the ripeness of the controversy, therefore, must be made in that light.

Even if plaintiffs' action is viewed in that light, however, the DOE's argument that this controversy cannot be ripe until either it finally determines or plaintiffs concede that Texaco is in violation of the challenged regulations is of considerable force, at least with respect to Texaco and LL&E. The complaints of all three plaintiffs contain the alternative assertions that, first, Texaco's pricing policies which are the subject of the pending DOE compliance proceeding do not violate the regulations at issue in this lawsuit and, second, to the extent they do violate those regulations the regulations are invalid. While Texaco describes the latter

---

**18.** That this action was brought after the commencement of an administrative compliance proceeding by the DOE does not require use of

a different mode of analysis. *See Exxon Corp. v. Federal Trade Commission*, 588 F.2d 895, 901 (3d Cir. 1978).

assertion as its "premier" position, it vigorously argues that it cannot be made to waive the former as the price of obtaining immediate judicial review of the DOE's regulations.

▮ I disagree. The ripeness doctrine prevents one complaining of agency action not from obtaining judicial review of that action altogether, but from doing so before it demonstrates that the action objected to has affected it concretely. *Abbott Laboratories v. Gardner, supra,* 387 U.S. at 148, 87 S.Ct. at 1515. *See also* Note, *Pre-Enforcement Review of Administrative Agency Action: Developments in the Ripeness Doctrine,* 53 Notre Dame Law. 346, 347 (1977). Such concreteness is assured in large part by the requirement that the party seeking relief be able to show that the final agency action challenged poses a direct and immediate hardship to it. As the District Court for the Northern District of Ohio stated in the *Standard Oil* case,

> In order for a federal agency's final decision on a question of law to be ripe for pre-enforcement, declaratory judgment review, judicial review, the plaintiff must demonstrate that it incurs an identifiable *hardship* which is *directly and immediately* traceable to the bare existence of a fixed agency position on the legal question which is the subject of the plaintiff's complaint.

*Standard Oil Co. v. Federal Energy Administration, supra,* 440 F.Supp. at 365–366 (emphasis in original). *See, also, Abbott Laboratories v. Gardner, supra,* 387 U.S. at 148, 87 S.Ct. at 1515. Where the party seeking immediate judicial review has been able to demonstrate that the final agency action challenged has occasioned concrete hardship and the other requirements of the ripeness doctrine have been satisfied, review has been granted. *See, e. g., Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 81 (1978); *Standard Oil Co. v. Department of Energy, supra,* 596 F.2d at 1039–1040; *A. O. Smith Corp. v. Federal Trade Commission,* 530 F.2d 515, 524 (3d Cir. 1976). Where, however, it has appeared that the hardship feared is minimal, remote in time, speculative, or contingent on the occurrence of some other event, the action has been found to be unripe and, therefore, unsuited for immediate judicial review. *See, e. g., Toilet Goods Association, Inc. v. Gardner, supra,* 387 U.S. at 164–166, 87 S.Ct. at 1524–1525; *Wearly v. Federal Trade Commission,* 616 F.2d 662 (3d Cir. 1980); *Diamond Shamrock Corp. v. Costle,* 580 F.2d 670, 673–674 (D.C. Cir. 1978); *Halleck v. Berliner,* 427 F.Supp. 1225, 1250 (D.D.C.1977).

In the typical case, though the Court conducts a searching inquiry to determine whether the party seeking relief satisfies the hardship requirement of the ripeness doctrine, it is taken for granted that the plaintiff is subject to the challenged action, that compliance with the action is expected by the agency, and that compliance will entail costs for the plaintiff. *See, e. g., National Automatic Laundry and Cleaning Council v. Schultz,* 443 F.2d 689 (D.C. Cir. 1971); *Pennzoil v. Department of Energy, supra,* 466 F.Supp. 238; *Romeo Community Schools v. Department of Health, Education, and Welfare,* 438 F.Supp. 1021, 1028 (E.D.Mich.1977). In the instant case, however, Texaco denies that compliance with the DOE regulations it seeks to challenge will impose any costs upon it by asserting, in its "secondary" position, that it has not violated those regulations. While the pricing dilemma Texaco would face might satisfy the hardship requirement were it clear that it violated the regulations, I do not understand how Texaco can be placed on the horns of a pricing dilemma by regulations with which it purports to comply and with which the DOE has yet to determine it does not comply. In short, Texaco has failed to allege or show that compliance with the DOE regulations it challenges will impose any costs upon it, let alone place it on the horns of an ongoing pricing dilemma.

▮ Texaco makes the further argument that its dispute with the DOE over the validity of Rulings 1975–15, 1977-1, and 1977–2 causes it to suffer direct and immediate hardship by subjecting it to "an agency proceeding of extraordinary dimensions,"

by injuring its public standing, and by impairing its ability to make future budgeting and planning decisions. The costs of defending an administrative enforcement proceeding and the injury to reputation resulting from the institution of such a proceeding can be factors to be considered in determining whether a party complaining of agency action has shown that the action has a direct and immediate impact upon it. *See, e. g., Standard Oil Co. v. Federal Energy Administration, supra,* 440 F.Supp. at 368–369; *Abbott Laboratories v. Gardner, supra,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681. In and of themselves, however, they do not constitute the burden required by the ripeness doctrine to warrant immediate judicial review. *See, e. g., Central Hudson Gas & Electric Corp. v. Environmental Protection Agency,* 587 F.2d 549, 559 (2nd Cir. 1978). This is neither surprising nor difficult to understand. If the costs associated with the defense of an administrative enforcement action and the injury to reputation caused by the pendency of such an action justified immediate judicial review under the ripeness doctrine, judicial pre-emption of the administrative process would be the rule rather than the exception.

■ Moreover, when a court evaluates a plaintiff's showing of cumulative burden, it must be careful to consider only those burdens which stem from the challenged agency action. The ripeness doctrine requires that the complaining party be able to show not only that it suffers a current hardship but also that that hardship is caused by the final agency action which it challenges. As I have earlier observed, in light of Texaco's failure to concede that it violates Rulings 1975–15, 1977–1, and 1977–2 and the fact that the DOE has yet to determine that Texaco has violated those regulations, they cannot be said to have a current adverse effect upon Texaco and may never do so. One cannot know whether they will have such an effect unless and until it is established in some manner that Texaco's practices violate those rulings. What Texaco points to as a "present" effect, the impact of its possible liability for $888,000,000 on

its ability to plan, is, in a sense, a current problem, but it stems from Texaco's concern about what the DOE may do or find at some point in the future and not from final action it has taken in the past. If steps taken, amounts expended, or other burdens shouldered by regulated companies because of anticipated future agency action justified judicial review, the objectives of the ripeness doctrine would again be frustrated. In sum, I conclude that the only relevant hardships shown by plaintiff are those which attend the enforcement proceeding and that those are insufficient to justify judicial review at this time. Because Texaco has failed to show that the DOE regulations it challenges place it on the horns of a pricing dilemma or have any other impact upon it of the kind required by the ripeness doctrine, its claims with respect to the validity of the regulations will be dismissed.

■ The same considerations counsel that LL&E's challenge to the validity of the regulations must be dismissed as well. As a holder of working and/or royalty interests in many of Texaco's LOC units the designation of which as separate properties is the subject of the pending agency compliance proceeding, LL&E has shared in the revenues generated by the sale of crude oil therefrom. Thus, like Texaco, it alleges that it suffers direct and immediate hardship in the form of an ongoing pricing dilemma, inability to make future budgetary and planning decisions, costs of defending its actions in the administrative compliance proceeding (in which it has intervened), and injury to reputation. However, LL&E's complaint, like Texaco's, asserts that Texaco's pricing policies are consistent with Rulings 1975–15, 1977–1, and 1977–2, and it challenges those rulings only to the extent that Texaco may violate them. In the absence of either a final DOE determination that LOC units in which LL&E holds a working and/or royalty interest are designated as properties in violation of the challenged regulations or a concession to that effect by LL&E, therefore, the hardship it fears is simply too speculative to permit judicial review at this time.

Like Texaco's and LL&E's complaints, Louisiana's makes the alternative assertions that Texaco's LOC units may be designated as properties consistent with the challenged regulations and that the regulations are invalid only to the extent that they purport to prohibit such designations. Accordingly, any hardship which Louisiana may suffer as a result of DOE action with respect to Texaco's pricing practices is also too speculative under the ripeness doctrine to justify immediate judicial review. Unlike Texaco and LL&E, however, Louisiana is not merely a complainant whose "rights are affected only on the contingency of future administrative action." *Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 420, 62 S.Ct. 1194, 1201, 86 L.Ed. 1563 (1942). It alleges that producers other than Texaco which make royalty and severance tax payments to it have acceded to the views which they believe are expressed in Rulings 1975–15, 1977–1, and 1977–2; have refunded the "overcharges" resulting from their earlier treatment of multiple LOC's located on a single premises as multiple properties, and have made claims against Louisiana for refunds of corresponding amounts of royalty and severance tax payments. As a result of these changes of pricing policy brought about by the challenged administrative actions, Louisiana points out that it faces the prospect of a multiplicity of administrative and/or judicial proceedings to determine its liability for these refunds. Based on these allegations, it argues that this is the kind of situation in which immediate judicial review of agency action is appropriate.

■ I decline to rule upon the DOE's motion to dismiss the Louisiana claims for want of ripeness until the DOE has filed its answer and indicated whether it intends to assert its apparent right under 28 U.S.C. § 1391(e) (1979 Supp.) to have these claims litigated in Louisiana or the District of Columbia.[19] If litigation of Louisiana's claim is to go forward, if at all, in another forum, I believe that Court should resolve the ripeness issue. Accordingly, I will defer decision on the pending motion as it relates to Louisiana's claim.[20]

## B. EXTRAPOLATION ISSUE.

■ As I have already noted, both Texaco and LL&E also challenge the fact that the OSC's overcharge claim in the PRO is based on an extrapolation from an audit of certain properties during certain time periods to other properties and/or time periods. The OSC's use of the extrapolation technique presents Texaco and LL&E with a current hardship, they assert, because under DOE regulations the factual allegations contained in a PRO establish a prima facie case, because the recipient of a PRO has the burden of going forward with evidence as to findings of fact or conclusions of law to which it objects, and because the failure of the recipient to challenge a finding of fact or conclusion of law contained in a PRO constitutes a waiver of the right to object thereto. Texaco and LL&E seek a judicial determination that use of the extrapolation technique violates their right to procedural and substantive due process. They purport to be entitled to immediate judicial review of this claim under exceptions to the exhaustion doctrine for clear violations of constitutional rights and for administrative ac-

---

19. When the DOE filed this Rule 12 motion, venue was appropriate because of the presence of Texaco. Accordingly, that filing did not waive any right the DOE may have under 28 U.S.C. § 1391(e).

20. The DOE's final contention is that this controversy is not ripe in any event because the amended property definition, which plaintiffs do not challenge, imposes no present hardship upon them in the way of a continuing pricing dilemma. I need not address this contention with reference to Texaco and LL&E in light of my conclusion that they have otherwise failed to meet the requirements of the ripeness doctrine. Whether or not the DOE's regulations place Texaco or LL&E in a continuing pricing dilemma is irrelevant to the hardship Louisiana alleges it currently suffers, which results from the apparent decision of other producers to accept and to change their property designation policies based on the DOE's interpretations of the property definition in Rulings 1975–15, 1977–1, and 1977–2.

tions which will be unreviewable upon subsequent agency order.[21]

According to Texaco and LL&E, the OSC's use of extrapolation violates due process in two respects. First, they allege, by basing the PRO's overcharge claims on the extrapolation technique the OSC has failed to provide them with the notice to which they are constitutionally entitled. Second, they argue, by predicating the PRO's overcharge claims on the extrapolation device the OSC has violated the DOE's procedural regulations which require that the PRO "shall set forth the proposed findings of fact and conclusions of law upon which it is based." 10 C.F.R. § 205.192(d). Their claim that the validity of the extrapolation device may not be reviewable later is also two-fold. First, they contend, if they undertake to audit each of their LOC units in order to respond to the PRO, their challenge to the validity of the extrapolation technique will become moot. Second, they aver, a court reviewing a RO may limit its inquiry to whether the order is supported by substantial evidence. I am unable to agree that Texaco and LL&E are now entitled to a judicial determination with respect to the validity of the OSC's use of the extrapolation device because I am not convinced that such use represents a clear violation of their constitutional rights or will be insulated from judicial review at the conclusion of the compliance proceeding.[22]

 As the District Court for the Northern District of Indiana has recently stated, "The 'clear right' exhaustion exception is generally accepted and formulated as follows: if an agency violates a clear right of a petitioner by disregarding a specific and unambiguous statutory, regulatory, or constitutional directive, a court will not re-

quire the petitioner to exhaust his administrative remedies and will intervene immediately." *Standard Oil Co. v. Federal Trade Commission,* 475 F.Supp. 1261, 1979-2 Trade Cases ¶ 62,776 at 78,446 (N.D.Ind. 1979). The exception is narrow, however, and justifies judicial review despite a failure to exhaust administrative remedies only under "extraordinary circumstances." *First Jersey Securities, Inc. v. Bergen,* 605 F.2d 690, 696 (3d Cir. 1979). Thus, a "mere allegation of a constitutional deprivation is insufficient to entitle the plaintiff to relief. . . . The plaintiff must present a clear and unambiguous violation by the agency." *Id.* at 697. *See also Barnes v. Chatterton,* 515 F.2d 916, 920 (3d Cir. 1975); *Exxon v. Federal Trade Commission,* 411 F.Supp. 1362, 1370 (D.Del.1976).

 While I need not now determine that the use made of the extrapolation technique in the DOE compliance proceeding is constitutionally pure, I do conclude that Texaco and LL&E have suffered no clear and unambiguous constitutional violation. Administrative complaints satisfy the notice requirements of the due process clause if they enable their recipients "to frame an answer and to understand the issues they will be required to meet." *Standard Oil Co. v. Federal Trade Commission, supra,* at 1273, 1979-2 Trade Cases at 78,451. I have little doubt that the PRO issue to Texaco, which is nearly three hundred pages long and is accompanied by an affidavit described by Texaco as "several feet high", satisfies this requirement. I also conclude that Texaco and LL&E have suffered no clear and unambiguous violation of any constitutional right by the OSC's possible noncompliance with the DOE's procedural regulations. Both the PRO, ¶¶ 665-673, and the

---

21. The parties have indicated that Texaco has moved to dismiss the extrapolation claims in the DOE compliance proceeding and that the OHA has deferred indefinitely Texaco's obligation to respond to those allegations. It is not clear from the parties' representations, however, that Texaco will not be required to respond to the allegations before the OHA rules on its motion for partial dismissal.

22. LL&E also argues that the issue of the validity of the extrapolation technique is ripe for immediate judicial review. I need not consider that argument because of my conclusion that the issue is not appropriate for judicial review at this time in any event as a result of Texaco's and LL&E's failure to show either that they have exhausted their administrative remedies or that the issue should be excepted from the requirements of the exhaustion doctrine.

affidavit of Erasmo Gonzales which accompanies it, state the factual premises on which the extrapolation device is based, as required by DOE regulations. The adequacy of those premises, either as a matter of fact or as a matter of law, present questions subject to resolution in the compliance proceeding and to which the exhaustion doctrine requires the DOE be permitted to apply its expertise in the first instance.

The exception to the exhaustion doctrine for administrative action which may not be subject to review upon a subsequent agency order is similarly narrow, *First Jersey Securities, Inc. v. Bergen, supra,* 605 F.2d at 696, and Texaco and LL&E have failed to demonstrate that the issue of the validity of the OSC's use of the extrapolation device falls within it. Any hardship they would suffer as a result of the need to audit Texaco's LOC units in order to respond to the OSC's overcharge allegations is indistinguishable in principle from the hardship countless other targets of administrative compliance actions have suffered in defending those actions. Plaintiffs have cited no case, and I have found none, in which the hardship alone has been considered sufficient to trigger immediate judicial review. *See, e. g., Central Hudson Gas & Electric Corp. v. Environmental Protection Agency, supra,* 587 F.2d at 559. This is not to say that dismissal of Texaco's and LL&E's challenge will necessarily be costless to them, but that whatever costs they must bear are warranted by the policies underlying the exhaustion doctrine. *See, e. g., Barnes v. Chatterton, supra,* 515 F.2d at 921. Finally, to whatever extent Texaco and LL&E may actually be prejudiced either by the OSC's failure to comply with DOE procedural regulations or by its failure to give adequate notice in the PRO, I can think of no cogent reason why those claims would not be considered by a Court on review of the final order in the DOE compliance proceeding.

### III. CONCLUSION.

For the reasons stated, Texaco's and LL&E's complaints will be dismissed in their entirety. Resolution of the DOE's motion to dismiss Louisiana's complaint will be deferred until the DOE files its answer.[23]

23. The DOE's motion to dismiss the complaints of LL&E and Louisiana also assert lack of standing as an independent ground requiring dismissal. However, the DOE did not address this ground in its briefing or at oral argument. Because of my conclusion that LL&E's complaint must be dismissed in any event, I need not address the question of its standing. As to Louisiana, for the same reasons I have decided to defer resolving the DOE's ripeness contentions I will not now address its standing argument.