**DEPARTMENT OF ENERGY and James B. Edwards, Secretary of Energy, Defendants-Appellants,**

v.

**STATE OF LOUISIANA, Plaintiff-Appellee,**

**Texaco Inc. and The Louisiana Land and Exploration Company, Plaintiffs-Intervenors-Appellees.**

Nos. 5–65, 5–66.

Temporary Emergency Court of Appeals.

Argued May 14, 1982.

Decided Sept. 17, 1982.

Judgment Entered Oct. 4, 1982.

Nancy C. Crisman, Dept. of Energy, with whom Frank W. Krogh, Judith A. Mather, Dept. of Energy, Washington, D. C., were on the brief; Paul M. Geier, David R. Hughes, Sarah Gottsman and Colin C. Carriere, Office of the Solicitor, Washington, D. C., of counsel, for defendants-appellants.

Allan Abbot Tuttle, Patton, Boggs & Blow, with whom James R. Patton, Jr. and George M. Borababy, Washington, D. C., of the same firm; Harry E. Barsh, Jr. and David R. Frohn, Camp, Carmouche, Palmer, Barsh & Hunter, Lake Charles, La., were on the brief for plaintiff-appellee.

John R. Cope, Roger L. Reynolds and Darci L. Rock, Bracewell & Patterson, Washington, D. C., were on the brief; J. Henry Phillips, III and Charles D. Marshall, Jr., Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, La., of counsel, for plaintiff-intervenor-appellee, The Louisiana Land and Exploration Co.

Andrew B. Kirkpatrick, Jr., William O. LaMotte, III and Richard D. Allen, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., were on the brief; Stephen H. Bard, Texaco Inc., White Plains, N. Y., and Patrick T. Caffery, Caffery, Oubre, Gibbens & Blackwell, New Iberia, La., of counsel, for plaintiff-intervenor-appellee, Texaco Inc.

Before METZNER, BECKER and HEMPHILL, Judges.

METZNER, Judge.

The Department of Energy (DOE) appeals from two orders of the District Court for the Western District of Louisiana.[1] The first order denied DOE's motions to dismiss the complaint and to vacate intervention orders. The second order granted the summary judgment motion of the State of Louisiana (plaintiff-appellee) and Texaco, Inc. and Louisiana Land and Exploration Company (plaintiffs-intervenors-appellees). The issues raised by DOE on these appeals concern exhaustion of administrative remedies, ripeness, standing, intervention and the propriety of the disposition on the merits by granting summary judgment to the appellees.

The dispute between the parties arises out of a DOE enforcement proceeding in which DOE claims that Texaco improperly sold domestically produced crude oil to its customers as new oil when the oil should have been classified as old oil which has a lower maximum price fixed by the regulations. Texaco is charged with having exceeded the authorized price for the period August 19, 1973 to September 1, 1976, by more than $748,000,000.

The State of Louisiana is involved in this litigation because it has collected severance taxes and royalties on oil rights from lessees of state owned land based on the classification of this oil as new oil. The Louisiana Land and Exploration Company (LL&E) is a private enterprise which has royalty interests and working interests in properties in which Texaco has a working interest.

The litigation commenced in the District Court of Delaware in 1979 when Texaco, as plaintiff, and the State of Louisiana and LL&E as intervenors, sought declaratory relief as to the meaning and validity of certain regulations and rulings of DOE. They also sought injunctive relief as to the aforementioned pending DOE enforcement proceeding against Texaco.

Specifically, plaintiffs sought a determination that multiple producing reservoirs operated by Texaco and LL&E and recognized by the Louisiana Office of Conservation (LOC) as separate producing units be treated as separate properties under DOE regulations for determining old and new oil even though they may be located on a single premises. The court dismissed the complaints of Texaco and LL&E as not ripe for judicial review. *Texaco, Inc. v. DOE*, 490 F.Supp. 874 (D.Del.1980). Thereafter, Louisiana filed a voluntary dismissal of its action disposing of that case.

---

1. *State of Louisiana v. Department of Energy,* 507 F.Supp. 1365 (W.D.La.1981); 519 F.Supp. 351 (W.D.La.1981).

Louisiana then instituted this action in the Western District of Louisiana where the court granted Texaco and LL&E leave to intervene. The relief sought by the amended complaint in this action is a declaration that reservoir-wide producing units established and recognized by Louisiana (LOC units) are separate properties for the purpose of federal oil and gas pricing regulation. A finding to this effect would classify the oil as new oil, and Texaco would not be liable to a claim for overcharges as to such oil.

## I.

### REGULATORY BACKGROUND

*The Meaning of "Property" under the Federal Price Control System*

The two-tier pricing system for crude oil was promulgated by the Cost of Living Council (CLC) on August 17, 1973, under authority of the Economic Stabilization Act of 1970. 38 Fed.Reg. 22536 (August 22, 1973). Congress reaffirmed this authority with the enactment of the Emergency Petroleum Allocation Act (EPAA). Pub.L. 93–159; 15 U.S.C. § 751 *et seq.*

CLC established two categories of domestically produced crude oil: old oil, which was subject to a price ceiling, and new oil, which could be sold at a higher free market price. For each "property" operated by a given producer, the classification of the oil was calculated monthly. The amount of oil produced from the property in the corresponding month of 1972 was the benchmark for classifying current production. Production less than the benchmark was old oil. Production in excess of the benchmark was new oil.

Because the two-tier system was thus based on a property-by-property comparison of current production with 1972 production, the definition of the term "property" was of fundamental importance. The CLC definition, however, was rudimentary:

" 'Property' is the right which arises from a lease or from a fee interest to produce domestic crude petroleum."

6 C.F.R. § 150.354, as amended 38 Fed.Reg. at 22538 (1973).

By September 1975, the Federal Energy Administration (FEA) had taken over the administration of the pricing system and issued the first interpretation of the property definition. In Ruling 1975–15 (40 Fed. Reg. 40832 (September 4, 1975)), the FEA addressed the question of how property designations should be made where several geologically distinct producing reservoirs were contained within the boundaries of a single leased tract. The agency stated that for purposes of the price regulations, "the property concept is one that identifies the right to produce crude oil, whether that right arises from a lease or from a fee interest." *Id.* Since the "right to produce" was the proper basis for making property designations, geological considerations such as reservoir boundaries were irrelevant.

On December 22, 1975, the Energy Policy and Conservation Act (EPCA) was enacted as an amendment to EPAA. Pub.L. 94–163. This legislation contemplated revisions to optimize production from domestic properties subject to a statutory maximum weighted average first sale price of $7.66 per barrel. The President had to determine that any departure from the then current controls would be likely to result in greater production from such properties. EPCA § 401, 15 U.S.C. § 757.

On August 20, 1976, FEA amended the property definition as part of an overhaul of the regulations pursuant to the EPCA. The original definition of property was continued with the following addition:

"A producer may treat as a separate property each separate and distinct producing reservoir subject to the same right to produce crude oil, provided that such reservoir is recognized by the appropriate governmental authority as a producing formation that is separate and distinct from, and not in communication with, any other producing formation." ·

41 Fed.Reg. 36172, 36184 (August 26, 1976); effective September 1, 1976. The FEA stated that the amended definition of property comports with the objective provided

in EPCA that producers are provided with an incentive "to develop new deep reservoirs which would result in all new crude oil production." Moreover, it "removes the disincentive some producers faced with respect to properties where declining production from existing reservoirs offset new production from other reservoirs which would otherwise have qualified for treatment as new crude oil." *Id.* at 36179.

In the preamble to this amendment, FEA made it clear that reservoir-by-reservoir property designations would not, in general, be accepted as a basis for calculating quantities of old and new oil produced prior to September 1. Such an interpretation of the old property definition was, in FEA's view, "expansive" and "unwarranted," and the agency concluded that retroactive ratification of property designations based on this interpretation would be unfair to those producers who had "adhered closely to the regulations." *Id.* at 36177. Thus, the new property definition would have prospective effect only and the validity of property designations before September 1976 would be determined by reference to the old definition. Further, in interpreting the old definition, the preamble sets forth in detail certain circumstances under which a leased premises might permissibly have been subdivided into several federal properties. *Id.* at 36176–77. State recognition of geologically distinct reservoirs is not one of the circumstances listed.

FEA reissued the text of the August 20 preamble as Ruling 1977–1. 42 Fed.Reg. 3628, 3629 (January 19, 1977). Six days later, FEA issued Ruling 1977–2, which reaffirmed the policy adopted in Ruling 1977–1 and set forth certain clarifications not relevant here. 42 Fed.Reg. 4409 (January 25, 1977). Although the agency policy here in question was originally enunciated in the August 20, 1976, preamble, the plaintiffs attack the 1977 rulings because the validity of the regulation is not being challenged.

### Texaco's Property Designations

Like many other states, Louisiana regulates the production of petroleum within its borders. Its purpose is conservation. As part of the regulatory scheme, LOC "for the prevention of waste and to avoid the drilling of unnecessary wells [establishes] a drilling unit or units for each [reservoir]." La.Rev.Stat.Ann. 30:9(B). Thus, a LOC unit never encompasses more than a single reservoir.

In making property designations for the purpose of the two-tier pricing system, Texaco frequently chose to designate reservoir-wide LOC production units as separate properties, even though more than one unit may be found within the confines of a single leased tract. Plaintiffs challenge the validity of Rulings 1977–1 and 1977–2 insofar as they would preclude such designations prior to September 1, 1976. DOE claims that these LOC units are not to be considered as separate properties before that date.

### II.

This court will first address the issues raised on the appeal from the denial of DOE's motion to dismiss (507 F.Supp. 1365). These issues are failure to exhaust administrative remedies, ripeness, standing and intervention.

### Exhaustion

DOE claims plaintiffs' action was not properly before the district court because plaintiffs have yet to exhaust administrative remedies.

It urges that the administrative proceedings at issue in this case will determine whether pricing regulations have been violated. Upon completion of these proceedings, DOE's Office of Hearings and Appeals may issue a Remedial Order (RO). 10 C.F.R. § 205.199(B). Section 503(c) of the Department of Energy Organization Act provides that an RO shall be reviewable in a hearing on the merits before the Federal Energy Regulatory Commission. 42 U.S.C. § 7193(c), 10 C.F.R. § 205.199(C). DOE further contends it is the final FERC order which constitutes the "final agency action" from which judicial review may be sought. While Section 503(c) is often asserted to

preclude review prior to final agency action, it is clear that the section is inapplicable to the case at hand.

As stated earlier, plaintiffs challenge the facial validity of FEA Rulings 1977–1 and 1977–2, upon which the DOE enforcement proceeding is predicated. There is no administrative appeal from a ruling. 10 C.F.R. § 205.154. The statutory exhaustion requirement of Section 503(c) does not apply to such challenges. Despite DOE's contentions to the contrary, the court below was correct in finding that plaintiffs challenge the interpretation rather than the enforcement proceeding.

■ The exhaustion doctrine, asserted in numerous other actions involving DOE,[2] requires that "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51 (1938). However, this doctrine is subject to numerous exceptions. *See, McKart v. United States,* 395 U.S. 185, 193–195 (1969). For example, among the exceptions are proceedings where the issues sought to be litigated are purely legal and where the agency has either taken a final position with respect to such issues or will not address them during the compliance proceeding. *See, e.g., Pennzoil v. DOE, supra* note 2 at 243–244; *Phillips Petroleum Co. v. Federal Energy Administration, supra* note 2 at 1248.

■ DOE, in this case, has made it clear it will not consider the validity of the challenged rulings at a subsequent stage of the compliance process. Counsel for DOE made such representation at oral argument before this court. This fact distinguishes this case from several recent TECA decisions in which the complaints were dismissed for failure to exhaust. *See, National Distillers and Chemical Corp. v. DOE,* 662 F.2d 754, 756 (Em.App.1981); *Missouri Terminal Co. v. Edwards,* 659 F.2d 139, 145 (Em.App.

1981); *Hawthorne Oil & Gas Corp. v. DOE,* 647 F.2d 1107, 1114 (Em.App.1981). Thus, the district court's consideration of plaintiffs' legal claims did not violate the doctrine of exhaustion, as the challenged rulings are, in fact, "final agency action."

*Ripeness*

■ DOE argues the district court should not have considered plaintiffs' claims because they were not ripe for judicial review. The test for ripeness in the preenforcement review context, which DOE asserts plaintiffs have not met, requires a finding that the following four factors be satisfied:

(1) the issues presented are purely legal,

(2) the issues arise out of final agency action,

(3) the controversy has a direct and immediate impact on plaintiffs' business, and

(4) litigation of the controversy will expedite final resolution of the matter rather than delay or impede effective agency enforcement efforts.

*Abbott Laboratories, Inc. v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Toilet Goods Association, Inc. v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); *Bankers Life & Cas. Co. v. Callaway,* 530 F.2d 625 (5th Cir. 1976); *Pennzoil Company v. DOE, supra* note 2; *Phillips Petroleum Co. v. Federal Energy Administration, supra* note 2.

Having determined that there has been "final agency action," this court need not further discuss the first two elements of the test.

■ In regard to the expedition/delay issue, this court looks to the case of *Northern Natural Gas Co., supra* note 2, which held:

"If the plaintiffs ultimately prevail here, the need for an agency enforcement action will be narrowed substantially, and

---

**2.** *See, Pennzoil Co. v. DOE,* 466 F.Supp. 238 (D.Del.1979); *Northern Natural Gas Co. v. DOE,* 464 F.Supp. 1145 (D.Del.1979); *Phillips Petroleum Co. v. Federal Energy Administra-*

*tion,* 435 F.Supp. 1239 (D.Del.1977), *aff'd sub nom. Standard Oil Co. v. DOE,* 596 F.2d 1029 (Em.App.1978).

possibly eliminated. If DOE prevails here, the judgment against the plaintiffs will be binding upon them in any other proceeding. While DOE contends that the plaintiffs must first challenge the regulations in an agency enforcement action, it has not suggested any cogent reasons why that procedure would be more efficient, or why this action will delay or impede any action it desires to institute." 464 F.Supp. at 1155. *Accord, Pennzoil, supra* note 2; *Dow Chemical U. S. A. v. Consumer Product Safety Comm'n,* 459 F.Supp. 378, 387 (W.D.La.1978). Thus, it is clear that the court below correctly concluded the fourth element had been satisfied.

■ We now address the question of whether this controversy has a direct, immediate impact upon plaintiffs; considering first, whether Louisiana, as plaintiff, has satisfied this element. Louisiana's interest in this litigation lies in its status as a sovereign and as a landowner. As a sovereign, it receives a severance tax based on the price at which oil and gas produced within the state are first sold or transferred; as a landowner, Louisiana leases its lands to producers and receives a royalty based on the price at which oil and gas are first sold or transferred.

Operating throughout the State of Louisiana are producers, other than Texaco, which make royalty and severance tax payments to Louisiana. These producers have acceded to the views they believe are expressed in Rulings 1975–15, 1977–1 and 1977–2, and have refunded the overcharges resulting from their earlier treatment of multiple LOC's located on a single premises as multiple properties. Consequently, Louisiana has received claims for refunds of corresponding amounts of royalties and severance tax payments.

Louisiana's only remedy, outside of immediate resolution of the "property" controversy, is to defend the numerous claims being made for refunds. This is precisely the situation found in *State of Florida v. Weinberger,* 492 F.2d 488, 492 (5th Cir.

1974), where Florida had to choose between undertaking "likely financial outlay and certain legislative and administrative effort," or undergoing the "risk [of] the at least temporary loss of funding which a conformity hearing ... could well produce."

Thus, Louisiana is not merely a complainant whose rights are affected only on the contingency of future administrative action. *See, Columbia Broadcasting System, Inc. v. United States,* 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942). The trial court correctly held Louisiana faced sufficient hardship to be properly before the court.

*Standing*

■ DOE claims that Louisiana lacks standing to maintain this action.

In order to overcome this contention, Louisiana has to show that it has suffered injury in fact and that its interests are within the zone of interests to be regulated by regulations and rulings under consideration. *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).[3] It is clear that Louisiana has met both parts of the test.

As indicated above, Louisiana is suing both as a sovereign and as a landowner. In both capacities it will lose revenues if the position of DOE is sustained. DOE has stated that it will maintain its present position as to the interpretation which it urges upon the court. The issue of the correct interpretation will not be resolved in the compliance proceedings. Louisiana is faced with refunding royalties and severance tax payments already made if the position with DOE is sustained. Finally, Louisiana clearly meets the zone of interest test as a landowner.

*Intervention*

■ The court below permitted intervention by Texaco and LL&E as of right under Rule 24(a) of the Federal Rules of Civil Procedure. The pertinent part of that

---

**3.** There is serious question as to whether the Supreme Court has abandoned the zone test. *See,* K. Davis, *Administrative Law Treatise* § 22.02–11 (Supp.1982).

rule provides in subparagraph (2) that intervention as of right is granted:

"(2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

It may be argued that the interests of Texaco and LL&E are adequately represented by the State of Louisiana. On the other hand, there is force to the argument that Texaco, faced with a claim of overcharge amounting to some $748,000,000 should not be compelled to have someone else represent its interest. However, it is not necessary to decide this point.

We find that there is adequate basis to permit intervention pursuant to Rule 24(b). There is no doubt that the claims of Texaco and LL&E and the main action have a common question of law, and that is all that the court has before it. Their intervention has not and will not delay or prejudice the adjudication of Louisiana and DOE's rights in the main controversy.

■ With intervention being properly allowed, we need not reach the issues as to the intervenors of ripeness, exhaustion of administrative remedies or the res adjudicata effect to be given to the decision of the Delaware District Court in *Texaco, Inc. v. DOE*, 490 F.Supp. 874 (D.Del.1980).

## III.

## SUMMARY JUDGMENT

The court below granted plaintiffs' motion for summary judgment which challenged the validity of Rulings 1977–1 and 1977–2 on two grounds. First, plaintiffs contend that FEA's failure to recognize reservoir-wide LOC production units as separate "properties" per se is an unreasonable interpretation of the property definition promulgated by the CLC in 1973. Second, plaintiffs contend—and the district court held—that they are entitled to summary judgment because their interpretation was reasonable in a period of agency confusion during which the only indicia of agency policy were contrary to the policy ultimately adopted, and the interpretation was abandoned prospectively at the same time it was imposed retroactively. We disagree with plaintiffs' contentions and reverse the order below.

*Reasonableness of FEA's Interpretation*

■ As we have already pointed out, the basic building block of the two-tier system for pricing old and new oil is the property concept. CLC's 1973 definition of "property" is "the right which arises from a lease or from a fee interest to produce crude petroleum."

Although the words "lease" and "fee" appear in the definition, the parties agree, and this court has held, that: "The focus of the 'property' definition is upon the 'right to produce,' not the fee or leasehold nature of the ownership interest." *Grigsby v. Department of Energy*, 585 F.2d 1069, 1083 (Em.App.1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1216, 59 L.Ed.2d 456 (1979). As pointed out in *Grigsby* at 1083 n. k, "the FEA has never stated that 'property' is always defined by the lease."

Absent extraordinary circumstances, the court will defer to an agency's interpretation of the meaning of its own regulation unless the interpretation is "plainly erroneous or inconsistent with the regulation." *Udall v. Tallman*, 380 U.S. 1, 17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), quoting *Bowles v. Seminole Rock Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). Under this standard of review, we find that Rulings 1977–1 and 1977–2 are reasonable insofar as they refuse to sanction the treatment of reservoir-wide LOC production units as separate properties.

When CLC created the two-tier pricing system in August 1973, it was seeking to "strike a balance" between the policy of restraining price increases and that of stimulating increased domestic production of crude oil. CLC Press Release, Aug. 10, 1973 (quoted in Ruling 1977–1, 42 Fed.Reg. 3628,

3630 (Jan. 19, 1977)). Three months after the program was established, EPAA was enacted. Congress directed that the price control and allocation system be continued and reaffirmed the dual objectives of the pricing system. "Most importantly, the President must, in exercising this authority, strike an equitable balance between the sometimes conflicting needs of providing adequate inducement for the production of an adequate supply of [oil] and of holding down spiraling consumer costs." H.Conf. Rep.No. 93–628, reprinted in [1973] U.S. Code Cong. & Ad.News 2688, 2703.

It was FEA's responsibility, in interpreting the 1973 property definition, to reconcile these "sometimes conflicting needs." FEA might rationally have chosen either to rely on the property interest or on concepts of state regulation in clarifying the meaning of the "right to produce." It chose the former.

Its analysis, set forth in Ruling 1977–1, begins with the finding "that the literal meaning of the term 'property' . . . is generally to be understood as synonymous with the physical 'tract' or 'premises' as to which a working interest is established by an oil and gas lease, or by a fee interest." 42 Fed.Reg. at 3631. The agency pointed out that: "Inasmuch as the lease is the basic document of the oil and gas industry, there should have been no doubt but that CLC intended by its definition of property to signify the premises described by an oil and gas lease" as the property in the vast majority of instances. 42 Fed.Reg. at 3632. Finally, this Ruling confirms what the agency had said two years before in Interpretive Ruling 1975–15 to the effect that separate reservoirs under a single lease constitute a single unit. 40 Fed.Reg. 40832, 40833 subsection F.

The agency has been consistent in this interpretation even though during 1976 it indicated the possibility that it might change its mind and adopt the definition contended for by the appellees here. On two occasions it offered a proposed new rule for comment. 41 Fed.Reg. 1564, 1571 (Jan. 8, 1976); 41 Fed.Reg. 16179, 16180 (April 16, 1976). After considering the comments received and giving the matter further thought, the agency rejected the proposals. 41 Fed.Reg. 4931, 4938–39 (Feb. 3, 1976); 41 Fed.Reg. 36172 (Aug. 26, 1976). The amended regulations were adopted effective September 1, 1976. They continued the prior definition of property up to September 1976 but changed the definition for the future. This was not an admission that the original definition and its interpretations were wrong or vague. It merely signified the determination of the agency that in the future the LOC unit designation would better achieve the goal of the pricing system to find new oil.

The preamble to the amended regulations stated that they were promulgated pursuant to EPCA. Section 401 of that act mandated revisions in the price control program to optimize domestic production while maintaining an initial weighted average first sale price for domestically produced oil not in excess of $7.66 per barrel. 15 U.S.C. § 757. See also S.Conf.Rep. 94–516, pp. 190–91, reprinted in [1975] U.S.Code Cong. & Ad.News 1956, 2031–33. FEA explicitly found that the amendment to the property definition would offer the industry greater incentive to increase exploration and production and thus determined that the amendment would further the policy enunciated by Congress. 41 Fed.Reg. 36172, 36178–79 (Aug. 26, 1976).

We find this analysis reasonable and its results to be consistent with the property definition and the policies underlying the two-tier pricing system. While Texaco in fact may have been uncertain as to whether designation of reservoir-wide LOC production units as separate properties was unwarranted, their confusion does not require this court to overturn an administrative interpretation of a regulation which is not clearly erroneous. *Energy Consumers and Producers Association v. DOE,* 632 F.2d 129, 142 (Em.App.), *cert. denied,* 449 U.S. 832, 101 S.Ct. 102, 66 L.Ed.2d 38 (1980); *Udall v. Tallman, supra.*

Plaintiffs rely heavily on *Grigsby v. DOE, supra,* for the proposition that a LOC pro-

duction unit constitutes a property for EPAA purposes, as a matter of law. But this case is not apposite.

*Grigsby* was concerned with a portion of Ruling 1975–15 which is not pertinent here. The case addressed an entirely different question: how to adjust property designations after a "unitization" by the state of Louisiana. The state in 1969 had ordered that five separately owned tracts and leases be pooled into a single production operation. It is not uncommon for operators of two or more adjoining leases producing from the same reservoir to pool their interests, surrendering their individual rights to produce to a single operator in return for a share of the total production. This often occurs after the reservoir has reached the declining stages of production and is usually accompanied by the introduction of enhanced recovery techniques. The operator coordinates production from the constituent leases, shutting in some wells and converting other previously producing wells into injection wells. 40 Fed.Reg. at 40832. In Louisiana, such an aggregation of leases is recognized by the LOC as a discrete production unit.

The realignment of the pattern of production would have played havoc with the federal pricing system had FEA permitted lease-by-lease property designations to continue in force after a unitization. It would have resulted in the recognition of artificially high quantities of new oil from some of the participating leases, while other leases would be producing less or not at all. It would have permitted an operator to gerrymander production patterns by shifting producing wells from one lease to another.

Ruling 1975–15 dealt with this problem by declaring, *inter alia,* that the entire unitized premises constituted the property for federal price control purposes. In *Grigsby,* the court upheld this interpretation as applied to a group of leases in Louisiana which had been unitized by LOC order. A more recent decision by this court has reaffirmed the rule that where the issue is unitization pursuant to a LOC-type order, the unit is the "property." *Pennzoil Co. v.*

*DOE,* 680 F.2d 156 (Em.App.1982). The Court specifically indicated that it was not considering the issue presented here. 680 F.2d at 178 n.42.

We find no inconsistency in our determination in this case with the holding in *Grigsby* or *Pennzoil* in the light of the issues presented. There is no invitation to gerrymander where several reservoir-wide production units are within a single lease, and therefore, there was no reason for FEA in this setting to depart from its general position that the lease defines the property.

## Standard Oil Doctrine

■ Citing our decision in *Standard Oil Co. v. DOE,* 596 F.2d 1029 (Em.App.1978), the court below held that FEA's interpretation of the property definition was not to be given preference over the plaintiffs' reasonable interpretation because deference to a retroactive agency interpretation is not warranted when the agency's interpretation, though reasonable is not compelled. 519 F.Supp. at 353. A similar argument was made by the oil producer in *Pennzoil, supra.* Judge Christensen carefully analyzed the *Standard Oil* doctrine and found it inapplicable in that case. We find that the doctrine is similarly inapplicable here for the very same reasons so cogently expressed by Judge Christensen, and rest on that opinion without further explication.

■ However, we would make one additional observation to support our conclusion. The wording of Ruling 1975–15 put the plaintiffs on notice that multiple reservoirs in a single lease or fee ownership would not be considered as separate properties even though they were separate LOC units for state purposes. More specifically, the ruling stated:

"While the FEA recognizes that various state and other federal regulatory authorities may, for other purposes, have monitored production levels on other bases (*e.g.,* by physical boundaries or by producing formations or reservoirs), it is necessary that the price regulations embody a uniform concept, the parameters of which can be readily applied to all domes-

tic production, regardless of varying state classifications. For this reason, FEA regulations utilize, as a reference, a property concept, based upon the right to produce crude oil, that can be readily identified for all producers.

. . . .

... In the majority of cases, involving only one lease that remains unchanged since 1972, a producer will simply compare his current monthly production for the property (the lease in those cases) against the corresponding monthly production for the lease in 1972."

40 Fed.Reg. 40832 (September 4, 1975). The ruling concluded by stating:

"F. *Production From More Than One Reservoir on a Single Property.* Because the property concept is based upon the right to produce crude oil, whether arising from a lease or from a fee interest, the existence of two or more separate and distinct reservoirs will not in itself create two or more separate 'properties'. Therefore ... where a producer holds a single right to produce crude oil from two or more reservoirs, together the two or more reservoirs constitute a single property; where there are separate and distinct rights to produce crude oil from each reservoir, each reservoir accordingly represents a different property."

*Id.* at 40833.

There is nothing confusing in this wording as applied to our specific problem. Plaintiffs knew that they were using a different interpretation in determining whether the oil being produced was old or new. They never sought an agency interpretation to sustain their position. Rather, they seem to have proceeded on the theory that their interpretation was reasonable and that it would afford them protection against such a claim as now being made by DOE. This, of course, is no defense. The history of the regulations, rulings and interpretations demonstrates that there was no justification for their position.

The order permitting Texaco and LL&E to intervene and finding that plaintiffs are not precluded from maintaining this action by reason of failure to exhaust administrative remedies, lack of ripeness or standing to sue, is affirmed. The order granting summary judgment to appellees is reversed and summary judgment is directed to be entered for appellants.

So ordered.