**CLARK OIL CO., INC., on Behalf of itself and all others similarly situated, Plaintiff,**

v.

**TEXACO INC., Defendant and Counterclaim Plaintiff,**

v.

**CLARK OIL CO., INC. and Department of Energy, Counterclaim Defendants.**

**Civ. A. No. 83–869 LON.**

United States District Court, D. Delaware.

May 9, 1985.

John James Conly, Wilmington, Del., for Clark Oil Co., Inc.; Gregg R. Potvin, of Southmayd, Powell, Taylor & Bower, Washington, D.C., of counsel.

Richard D. Allen, and William O. LaMotte, III, of Morris, Nichols, Arsht & Tunnel, Wilmington, Del., for Texaco Inc.; Joseph P. Foley, and David A. Luttinger, of Texaco Inc., New York City, of counsel.

Sue L. Robinson, Asst. U.S. Atty., Wilmington, Del., for Dept. of Energy; Marcia K. Sowles, Larry P. Ellsworth, Maureen Katz, and David A. Engels, Dept. of Energy, Washington, D.C., of counsel.

## OPINION

LONGOBARDI, District Judge.

This is an action for damages filed by Clark Oil Co., Inc. ("Clark"), on its own behalf and as the representative of a class of Texaco distributors, against Defendant Texaco, Inc. ("Texaco") under section 210 of the Economic Stabilization Act, 12 U.S.C. § 1904. Clark, a distributor of Texaco products, alleges that Texaco violated the Department of Energy's ("DOE") crude oil price regulations thereby overcharging it and the other class members during the period between September 1, 1973, and January 18, 1981. Texaco has joined DOE as a third-party Defendant by filing what is captioned a counterclaim against both DOE and Clark challenging DOE's interpretation of the regulatory definition of "property." Presently pending before the Court is DOE's request that this Court stay the case pending the completion of DOE's ongoing administrative enforcement proceeding against Texaco or, in the alternative, dismiss Texaco's counterclaim since DOE is not a necessary party in the private action and Texaco's claim is not ripe for judicial review.

### REGULATORY BACKGROUND

The questions at issue in Texaco's counterclaim have been the subject of a long line of judicial and administrative proceed-

ings. The dispute arises out of DOE[1] regulations first promulgated in 1973 which subject domestic crude oil production to a two-tier system of federal price controls.[2] 38 Fed.Reg. 22,536 (Aug. 22, 1973); 10 C.F.R. 212. At that time, the objective of the pricing system was to stimulate domestic crude oil production while controlling inflation by maintaining price controls on oil presently being produced. 41 Fed.Reg. 36,172, 36,173 (Aug. 16, 1976). To achieve this objective, the regulations set up two categories of domestically produced crude oil: "old oil" which was subject to a price ceiling; and "new oil" which could be sold at a higher free market price. In order to determine the amount of oil subject to the ceiling price, producers were required to measure current monthly production and sale of crude oil from a "property" against the amount of crude oil produced and sold from that same "property" in the same month of 1972. Because of the necessity of determining whether oil should be classified as old or new oil in order to determine whether it was subject to the price ceiling, the "property" concept became "the most fundamental aspect of the two-tier pricing system.[3] 41 Fed.Reg. 4931, 4938. Unfortunately, the definition of "property" promulgated by the agency in 1973 provided little guidance as to how it should be applied. The definition merely stated that " '[p]roperty' is the right which arises from a lease or from a fee interest to produce domestic crude oil." 38 Fed.Reg. 22,536, 22,538; 10 C.F.R. 212.72.

The first interpretation of the property definition was set forth two years later in Ruling 1975–15 and stated the following:

... the existence of two or more separate and distinct reservoirs will not in itself create two or more separate "properties".... [W]here a producer holds a single right to produce crude oil from two or more reservoirs, together the two or more reservoirs constitute a single property; where there are separate and distinct rights to produce crude oil from each reservoir, each reservoir accordingly represents a different property.

40 Fed.Reg. 40,832, 40,833 (Sept. 4, 1975).

Ruling 1975–15 did not resolve the issue of when, if ever, oil production from a "single right to produce" could legitimately be broken into separate properties, although DOE attempted to resolve that issue on several other occasions. *See,* 41 Fed.Reg. 1564 (Jan. 8, 1976); 41 Fed.Reg. 4931 (Feb. 3, 1976); 41 Fed.Reg. 16,179 (Apr. 16, 1976). Thus, the "right to produce" definition remained substantially unchanged until August of 1976 when DOE issued amendments to the original definition. The amendments were entitled "Clarifications to Mandatory Petroleum Price Regulations Applicable to Domestic Crude Oil" and addressed application of the "property" definition both prospectively and retroactively. For prospective purposes, DOE adopted an amended definition of "property" which became effective on September 1, 1976. The new definition provided:

"Property" means the right to produce domestic crude oil, which arises from a lease or from a fee interest. A producer may treat as a separate property each separate and distinct producing reservoir subject to the same right to produce crude oil, provided that such reservoir is

---

**1.** The regulations were first issued and administered by the Cost of Living Council ("CLC") in 1973. By September, 1975, the Federal Energy Administration ("FEA") had taken over the administration of the pricing system. Today, the regulations are administered by the Department of Energy ("DOE"). To avoid needless confusion, this opinion will refer to the responsible agency as DOE.

**2.** The regulations were issued pursuant to authority conferred by the Economic Stabilization Act of 1970, 12 U.S.C. § 1904, the Trans-Alaska

Pipeline Authorization Act, Pub.L. 93–153, 87 Stat. 576 (1973); the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. §§ 751, *et seq.;* the Energy Policy and Conservation Act, 42 U.S.C. §§ 6201, *et seq.;* and the Department of Energy Organization Act, 42 U.S.C. §§ 7101, *et seq.* (1977).

**3.** For a diagram illustrating how the property concept affects oil pricing procedures, see Appendix A.

recognized by the appropriate governmental regulatory authority as a producing formation that is separate and distinct from, and not in communication with, any other producing formation.

41 Fed.Reg. 36,172, 36,184 (Aug. 26, 1976); 10 C.F.R. 212.72. In the preamble to the new regulation, DOE discussed the advantages of the new approach by noting that it combined the incentive to develop new resources inherent in a reservoir by reservoir approach with administrative ease since DOE could defer to the appropriate state agency to make the reservoir by reservoir determination. *Id.* at 36,179.

The preamble also set forth a number of retroactive clarifications to the property definition. The discussion made it clear that, in most situations, separate "property" designations would not be accepted as a basis for calculating quantities of old and new oil produced prior to September 1 unless such designations were pursuant to a separate right to produce. "Although the evidence is not unambiguous, FEA has concluded that CLC by its definition of the term 'property' intended to refer to the premises described in the oil and gas lease pursuant to which crude oil was being produced." 41 Fed.Reg. at 36,174. The agency concluded that it would have been "expansive" and "unwarranted" to give the old property interpretation such a broad meaning as to permit treatment of separate reservoirs as separate properties. It found that such a broad retroactive interpretation would be unfair to producers who had "adhered closely to the regulations." *Id.* at 36,177.

Nonetheless, the agency also noted that circumstances "may have made it inequitable or impracticable to apply the literal meaning of [the right to produce definition] in certain circumstances." *Id.* at 36,174. Thus, in a few circumstances, a single lease or fee interest might create more than one right to produce or premises subject to a single right to produce could be treated as multiple properties. The agency found that a single instrument could create more than one right to produce "where the rights or duties created under a single instrument are significantly different ... [and] a producer has in good faith relied upon such differences...." 41 Fed.Reg. 36,172, 36,176. In addition, premises subject to a single right to produce could be treated as separate properties in four situations: (1) where a fee or lease interest conveyed a single right to produce for noncontiguous tracts that were developed, produced and historically accounted for as separate entities; (2) on a very large tract where "separate geological formations" were developed, produced and accounted for separately; (3) if less than an entire premises had been unitized [4] with premises subject to another right to produce the non-unitized portion could be accounted for as a separate property; and finally (4) portions of a premises subject to a single right to produce could be treated as separate properties "where the production from identifiable portions of the premises is required to be measured and accounted for separately for purposes of determining severance tax liability or for purposes of accounting to royalty owners." 41 Fed.Reg. at 36,176–77.

These clarifications contained in the August 20 preamble were reissued as Ruling 1977–1 on January 19, 1977. 42 Fed.Reg. 3628. Six days later, DOE issued Ruling 1977–2 which reaffirmed the policy adopted in 1977–1 and attempted to resolve issues left open by the August 20, 1976 release. 42 Fed.Reg. 4409 (Jan. 25, 1977).

Ruling 1977–1 reprinted the August 20 Notice almost verbatim. 42 Fed.Reg. 3628, 3629, note 1. DOE stated that the "purpose of this Ruling is simply to set forth in the format of a Ruling the FEA interpretations, which were initially set forth in the August 20 notice ... to eliminate possible questions concerning the legal significance of the August 20 clarification." *Id.* Like-

---

**4.** It is not uncommon in the oil industry for less than an entire premises subject to one right to produce to be aggregated, *i.e.,* unitized, with all or portions of premises subject to another right to produce.

wise, Ruling 1977–2 was issued to further clarify some of the substantive issues addressed in the August 20 notice. The first clarification addressed the issue of whether retroactive determinations of property status made in accordance with the clarifications set forth in Ruling 1977–1 could be used after September 1, 1976. 42 Fed.Reg. 4409, 4410. The FEA concluded that producers that had previously made property designations consistent with the clarification contained in the August 20 notice and Ruling 1977–1 could continue to use those designations after September 1, 1976. However, DOE would not allow such treatment to be adopted for the first time pursuant to FEA's issuance of the August 20 notice. *Id.*

The 1977–2 clarifications exemplified the strict application DOE had chosen to give its retroactive property clarification. For example, DOE clarified its position on segregation of a premises subject to a single right to produce according to severance tax or royalty owner accountability. The agency stated that the mere existence of separate royalty owners and a requirement to account to them separately for their proportional interests did not justify treating the premises as a separate property. *Id.* at 4410. The ruling also reiterated the conclusion of Ruling 1977–1 which stated that producers were never justified in treating premises as separate properties simply because of the existence of separate reservoirs.[5] The clarification centered on the "very large tract" exception to the right to produce definition first set forth in the August 20 notice. At that time, DOE had stated: "separate geological formations subject to the same right to produce which have been developed and produced separately, and which have historically and consistently been accounted for separately may continue to be so regarded." 41 Fed. Reg. 36,172, 36,177. Ruling 1977–1 deleted that reference to "geological formations"

out of concern that the provision might have been construed as permitting those producers operating on very large tracts with more than one reservoir to treat each reservoir as a separate geological formation and thus as separate properties. 42 Fed.Reg. 3628, 3629 n. 2. Ruling 1977–2 further clarified this definition by stating that a "geological formation" was not an individual reservoir but comprised several reservoirs generally having common characteristics. 42 Fed.Reg. 4409, 4411 (Jun. 25, 1977).

Ruling 1977–2 also attempted to clarify the prospective definition of property as set forth in the August 20 notice particularly in respect to what constitutes the "recognition" by the appropriate governmental authority which will allow a property subject to a single right to produce to be accounted for separately. 42 Fed.Reg. 4409, 4411. The agency acknowledged that the matter may often be left for resolution on a case by case basis and set forth the general guidelines to be used in making such determination. The most important requirement was that a state regulatory body must have made a factual determination that the "reservoir is separate and distinct from, and not in communication with, any other reservoir subject to the same right to produce."[6] *Id.* at 4411.

## ADMINISTRATIVE PROCEEDINGS

In 1975, DOE began a preliminary investigation of Texaco's compliance with the crude oil pricing regulations. At the conclusion of that preliminary audit, the agency advised Texaco that it had reason to believe Texaco had violated the regulations in a number of ways, one of which was through the use of improper property determinations. Over a year later, on August 1, 1977, DOE initiated a formal audit of Texaco's compliance with the oil pricing regulations. On December 12, 1977, DOE

---

**5.** It is these two clarifications concerning severance tax or royalty owner accountability and separate reservoirs which Texaco contests. By summarizing the agency's actions, the Court in no way takes a position on Texaco's arguments.

**6.** The 1977–2 ruling went on to detail what makes a reservoir separate and distinct from another. 42 Fed.Reg. 4412. That discussion is not relevant here.

issued a "Fact Statement" which asserted that Texaco's property determinations were in violation of the definition of property in 10 C.F.R. Section 212 and Rulings 1975–15, 1977–1 and 1977–2. The Office of Special Counsel[7] ("OSC") began an enforcement proceeding by issuing a Notice of Probable Violation ("NOPV") to Texaco.[8] The NOPV identified the instances where OSC had tentatively concluded that Texaco had violated the price controls. On May 1, 1979, the administrative proceedings advanced to the next stage when OSC issued a Proposed Remedial Order ("PRO") to Texaco.[9] The PRO alleged that Texaco had violated the pricing regulations from September, 1973, through March, 1979, and that the overcharges resulting from Texaco's pricing violations were over $748,000,-000 plus interest and involved over 1,500 "properties."

Pursuant to the regulatory procedure, Texaco filed the required Notice of Objection within fifteen days after publication of the notice of the PRO. 10 C.F.R. 205.-193(a). In addition, Texaco requested a three hundred sixty-five day extension to file its statement of objections to the PRO.[10] DOE granted a modified extension and, on August 10, 1979, Texaco filed a "Preliminary Statement of Legal Objections" alleging that the DOE rulings and the pricing regulations were procedurally and substantively invalid and that even if the rulings were valid, Texaco's property determinations were proper.

The next step in the regulatory process was an evidentiary hearing before the Office of Hearings and Appeals ("OHA")[11] which is ongoing at this time. Both legal and factual issues have been briefed and argued at this hearing which has lasted almost five years.[12] Briefing on the factual objections alone contained over 8,000 pages of text excluding exhibits. Upon conclusion of the hearing, the OHA may issue a final Remedial Order. The Remedial Order may adopt the findings contained in the PRO or any modification thereof. 10 C.F.R. 205.199(B). The filing of a Remedial Order, however, does not represent the end of the administrative proceedings. The Remedial Order may then be appealed to the Federal Energy Regulatory Commission ("FERC"). The Commission may stay the effect of the Remedial Order, unless the public interest requires otherwise, and afford the parties "an opportunity for a hearing, including, at a minimum, the submission of briefs, oral or documentary evidence, and oral arguments." 42 U.S.C. § 7193(c). Considering the length of time which has already expired in this case, the appeal proceeding could take a substantial amount of time.

**PRIOR JUDICIAL PROCEEDINGS**

The controversy in this case has not been confined to the administrative area. In July of 1979, shortly after the PRO was issued, Texaco filed suit in this court. In that suit, as in the instant case, Texaco

7. OSC is an office of the Economic Regulatory Administration within DOE and was responsible for enforcement of the Mandatory Petroleum Price and Allocation Regulation, 10 C.F.R. Parts 210, 211 and 212 with respect to the nation's thirty-four major oil refining companies.

8. A NOPV may be issued if the ERA has reason to believe that a regulatory violation has occurred, is continuing or is about to occur. 10 C.F.R. 205.191(a).

9. A Proposed Remedial Order sets forth the relevant facts and law and is issued if the ERA finds, after the 30 day or other period authorized for reply to the NOPV, that a violation has occurred, is continuing or is about to occur. 10 C.F.R. 205.192(a), (c).

10. The regulations require that a person who has filed a Notice of Objection shall file a Statement of Objections to a Proposed Remedial Order within 40 days after service of the Notice of Objection. An extension of time may be granted for good cause. The Statement of Objections should set forth the issues of fact or law which the person intends to contest. 10 C.F.R. 205.-196(a), (b).

11. The OHA is an adjudicatory body within the DOE which is separate from the agency's enforcement branch.

12. The hearing was expected to conclude in May, 1985, although the Court has no information as to whether or not it has concluded at this time.

challenged DOE's interpretation of the definition of property. This court dismissed the suit on ripeness grounds finding that Texaco's claim could not be ripe until DOE determined or Texaco conceded that its actions were in violation of the challenged regulations. *Texaco, Inc. v. Department of Energy,* 490 F.Supp. 874, 887 (D.Del. 1980). The suit was also dismissed on ripeness grounds as to Louisiana and the Louisiana Land and Exploration Company ("LL & E") which had been granted leave to intervene in Texaco's action. *Id.* at 889.

Louisiana then refiled in the United States District Court for the Western District of Louisiana seeking a finding on substantially the same issue, *i.e.,* whether reservoir-wide producing units established by the state were separate "properties" for the purposes of the oil pricing regulations. The court then granted Texaco and LL & E leave to intervene and ultimately granted plaintiffs' motion for partial summary judgment. *State of La. v. Department of Energy,* 519 F.Supp. 351 (W.D.La.1981). DOE appealed and the Temporary Emergency Court of Appeals reversed. *Department of Energy v. State of Louisiana,* 690 F.2d 180 (TECA 1982). The appeals court found ripeness not to be a barrier in that case because Louisiana was suffering an immediate and direct hardship as a result of the property controversy.[13] The court then went on to defer to the agency's interpretation of the meaning of its own ruling, finding that Rulings 1977–1 and 1977–2

were reasonable insofar as they refused to sanction the treatment of reservoir-wide LOC [14] production units as separate properties prior to September of 1976. On April 4, 1983, the Supreme Court denied Texaco's petition for writ of certiorari. 103 S.Ct. 1522 (1983).

The TECA decision in *Department of Energy v. Louisiana* precludes Texaco from asserting on a pre-1976 basis that its treatment of LOC units as separate properties was proper under the regulations. However, the validity of the regulations and Texaco's treatment of separate reservoirs and severance tax or royalty owner entities as separate properties has yet to be litigated. Until that determination is made, Texaco's overall liability remains in question. Thus, the administrative enforcement proceeding has continued and Texaco has filed a counterclaim for declaratory judgment in this court on the remaining legal issues. From the face of the counterclaim, this Court finds that the exact relief sought by Texaco is difficult to determine. Even at argument, the Court found it necessary to request some definition of the relief requested. However, after a reading of the briefs and hearing counsel for Texaco's further statements at oral argument, it appears that Texaco seeks an affirmative statement of the proper legal standards to be used in determining the validity of Texaco's property designations between 1973 and 1981.[15] After consideration of the

---

**13.** Louisiana's interest lay in the fact that it received a severance tax based on the price at which oil and gas produced in the state is first sold or transferred. Louisiana also receives a royalty on lands that it leases based on that same price. The changed interpretation of the definition of property caused many producers to refund overcharges to dealers resulting from their earlier treatment of multiple state defined units as multiple properties. Louisiana then received claims for refunds of corresponding amounts of royalties and severance tax payments. Immediate resolution of the property concept provided Louisiana with a necessary finding to adequately defend its position. 690 F.2d at 187.

**14.** The LOC is the agency primarily responsible for the regulation of the production of oil and gas within the State of Louisiana. A LOC unit is

the name given the reservoir-wide producing units established and recognized by Louisiana for regulatory purposes.

**15.** In its brief, Texaco argues that it merely seeks an answer to two basic administrative law questions, the first of which is "whether the August 20 notice document constituted a legislative rule and, if so, whether the subsequent DOE pronouncements modifying that rule are invalid because of the failure to follow the administrative procedures necessary to modify a legislative rule." Secondly, Texaco seeks a determination as to whether or not "Rulings 1977–1 and 1977–2 and clarification 78–5 are valid ... or invalid attempts to legislate...." Texaco's Answering Brief, p. 26. However, a close examination of Texaco's counterclaim reveals that such a finding is not as simple as Texaco suggests.

briefs and oral argument, the Court finds that DOE's motion to stay shall be granted on the ground of primary jurisdiction.

## RIPENESS

DOE asserts that this court's decision in *Texaco, Inc. v. Department of Energy,* 490 F.Supp. 874, dismissing Texaco's challenge to DOE's pricing regulations on ripeness grounds is dispositive of Texaco's counterclaim in the present action. As it argued in *Texaco,* DOE maintains that this action cannot be ripe until the agency determines or Texaco concedes that it has violated the challenged regulations. Texaco argues that although it has not yet conceded that it has violated the regulations, the circumstances in this case differ substantially from those in *Texaco, Inc. v. Department of Energy.* In the prior case, Texaco as plaintiff presented the contested issues of regulatory construction. In the present case, the issues of regulatory construction arise as the natural consequence of a private action for damages brought by Clark Oil against Texaco as Defendant.

■ In addressing the contentions of the parties, it is necessary to keep the basic rationale of the "ripeness doctrine" in mind. In the context of pre-enforcement review of agency action, the major purpose of the doctrine is to prevent the courts "from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).[16] The *Abbott Laboratories* trilogy set forth four considerations in determining whether a controversy is ripe for pre-enforcement judicial relief:

(1) whether the issues presented are purely legal; (2) whether the issues are based on final agency action; (3) whether the controversy has a direct and immediate impact on the plaintiffs' business; and (4) whether the litigation is calculated to expedite final resolution rather than delay or impede effective agency enforcement. *Phillips Petroleum Co. v. Federal Energy,* 435 F.Supp. 1239, 1245 (D.Del.1977).

These questions were addressed by Judge Stapleton in *Texaco, Inc. v. Department of Energy,* 490 F.Supp. at 887. After answering the first two questions in the affirmative, he went on to discuss the requirement of direct and immediate hardship. Noting that an action is unsuited for judicial review where "hardship feared is minimal, remote in time, speculative, or contingent on the occurrence of some other event", he found that "in light of Texaco's failure to concede that it violates Rulings 1975–15, 1977–1, and 1977–2 and the fact that the DOE has yet to determine that Texaco has violated those regulations, they cannot be said to have a current adverse effect upon Texaco...." 490 F.Supp. at 889.

Nothing has changed since Judge Stapleton's opinion of 1980. Texaco has still not conceded that it has violated any agency regulations nor have any violations been found by the agency. Nothing has changed except the fact that Clark Oil has brought a private action against Texaco thereby giving Texaco another opportunity to litigate the issues of regulatory construction raised in its 1980 lawsuit against DOE. Texaco contends that the issues raised by its counterclaim are now ripe because they are raised in the context of Clark Oil's action and must be resolved in order to determine whether Texaco is liable to Clark Oil. The Court finds this argu-

---

In asking this Court to determine the legal significance of agency pronouncements, Texaco also requests an interpretation of the August 20 pronouncement in that Texaco seeks a finding as to the meaning of the "very large tract" and the "severance tax or royalty owner accountability" retroactive exceptions to the "right to produce" definition of property.

**16.** *Abbott Laboratories* is the first in a trilogy of cases where the Supreme Court addressed the ripeness doctrine in the context of pre-enforcement review of agency action. *See also, Toilet Goods Association v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967) and *Gardner v. Toilet Goods Association,* 387 U.S. 167, 87 S.Ct. 1530, 18 L.Ed.2d 704 (1967).

ment persuasive and agrees that were the Clark Oil case to go forward at this time, the issues raised by Texaco's counterclaim would be decided. Thus,. the real question facing the Court is whether to proceed with the entire Clark Oil case, including the issues raised in Texaco's counterclaim, or stay the entire action on the grounds of primary jurisdiction pending the outcome of the agency proceeding.

## PRIMARY JURISDICTION

■ DOE argues that this Court should stay proceedings in the Clark Oil action because of the doctrine of primary jurisdiction. The doctrine of primary jurisdiction has been referred to as "a principle, now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over...." *Far East Conf. v. United States,* 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952). When primary jurisdiction is applied, the court stays its proceedings in a case until the agency adjudication is complete. The purpose of the doctrine is not to divide power between a court and an agency but to determine which tribunal is best able to make an initial finding. "The reason for the doctrine is not a belief that an agency's expertise makes it superior to a court; rather, the reason is that a court confronted with problem's within an agency's area of specialization should have the advantage of whatever contributions the agency can make to the solutions." *Quigley v. Exxon Company U.S.A.,* 376 F.Supp. 342, 355 (M.D.Pa. 1974). In addition to the added benefits of an agency's expertise in a particular area, the primary jurisdiction doctrine ensures uniformity in the law. If courts act without any consideration of what a specialized agency has to offer "parties who are subject to the agency's continuous regulation may become the victims of uncoordinated and conflicting requirements." 3 Davis, *Administrative Law Treatise* at 5, § 19.01 (1958).

■ The primary jurisdiction doctrine was originally developed in actions arising under the Interstate Commerce Act, *see, Texas & Pac. Ry. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907), but is now applied in any situation where the matter brought before the federal court is within the special competence of an agency. *Terrell Oil Corp. v. Atlantic Richfield Co.,* 468 F.Supp. 860, 864 (E.D. Tenn.1977). Application of the doctrine is particularly appropriate where complex policy considerations are at issue.[17] For example, in deciding whether AT & T had to provide inter-connection service to a competitor, the Third Circuit chose to defer to the expertise of the FCC.

> For a court to resolve this issue results in a judicial determination of the scope of permissible competition between the specialized carriers, such as MCI and the existing carriers, such as AT & T. Such a determination, involving, as it must, the comparative evaluation of complex technical, economic, and policy factors, as well as consideration of the public interest, should be made, in the first instance, by the administrative agency which has been entrusted with the primary responsibility for making such a determination and which has the expertise necessary for the development of sound regulatory policy.

*MCI Communications v. American Telephone & Telegraph Co.,* 496 F.2d 214, 222 (3d Cir.1974).

■ As the MCI opinion suggests, primary jurisdiction is not always applied whenever an agency and a court have concurrent jurisdiction. Indeed, primary jurisdiction should only be utilized if an agency's special technical or policy expertise

---

17. The doctrine is particularly applicable in actions such as this arising under the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. §§ 751, *et seq. See, e.g., Tresler Oil Co. v.* *Champlin Petroleum Co.,* 530 F.Supp. 696 (S.D. Ohio 1982); *Terrell Oil Corp. v. Atlantic Richfield Co.,* 468 F.Supp. 860 (E.D.Tenn.1977).

would be advantageous in reaching a final decision. For example, in *Nader v. Allegheny Airlines*, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976), the doctrine was found inapplicable in spite of the concurrent jurisdiction of the court and the Civil Aeronautics Board since the question at issue was a common law claim which did not bring into play any technical question of fact uniquely within the agency's expertise. *Id.* at 306–07, 96 S.Ct. at 1988.

Although no fixed formula exists for applying primary jurisdiction, *United States v. Western Pac. R. Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956), the Temporary Emergency Court of Appeals has set forth four factors to be considered: (1) whether the question at issue is within the conventional experience of judges; (2) whether the question at issue lies peculiarly within the agency's discretion or requires the exercise of agency expertise; (3) whether a danger of inconsistent rulings exists; and (4) whether a prior application was made to the agency. *Oasis Petroleum Corp. v. U.S. Depart. of Energy*, 718 F.2d 1558, 1564 (TECA 1983).

◼ Texaco maintains that these criteria are not met in the present case. It argues that its counterclaim places narrow legal issues before the Court in that it merely seeks a determination as to the construction and validity of the August 20 pronouncement and its subsequent clarifications.[18] Texaco argues that such a narrow legal question is within the conventional experience of judges and requires little agency expertise. It is true that a court need not always defer to the agency for its initial decision when the question at issue is purely legal. *Mobil Oil Corp. v. Department of Energy*, 520 F.Supp. 420, 448 (N.D.N.Y.1981), *rev'd on other grounds*, 659 F.2d 150, *cert. denied*, 454 U.S. 1110, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981). However, even if the Court were to accept Texaco's argument that the issues raised in the *counterclaim* are simple legal issues, the counterclaim cannot be examined out of the context of the entire Clark Oil case.

DOE has moved for a stay of the entire case, not simply for a stay of action on the counterclaim. Texaco itself states that the issues in Texaco's counterclaim "are part and parcel of Clark Oil's damage action." Thus, the real question before the Court is whether primary jurisdiction should prevent the court from beginning any proceedings in the Clark Oil case at this time.

◼ When all the aspects of Clark Oil's case against Texaco are considered, it becomes apparent that this case is an optional case for primary jurisdiction to be applied. There are two steps that must be taken before this Court could come to a final decision in this case. The first step is a legal determination as to the meaning and legal significance of the August 20 notice and the subsequent agency rulings which would involve not only an examination of the procedures used in adopting the pronouncements but also a finding as to the substantive meaning of any pronouncement found to be valid. In the present case, such a determination involves much more than a simple finding as to the meaning of words used in their ordinary sense. As the long history leading up to this lawsuit suggests, years of policy considerations have gone into the formulation of this regulation. The agency is more familiar with the shifting policy and technical considerations behind the implementation of these regulations than is this Court. In light of the long and involved history of the "property" definition at DOE, the only prudent path to follow is to allow those responsible for the creation of that history to make an initial determination as to its meaning.

Even if this Court chose to make a determination as to the legal issues presented in the case, the remaining factual determinations are even more complex. An evaluation of Texaco's compliance with the pricing regulations requires the application of the regulations to more than 1,500 "properties." The fact that the Evidentiary Appendix submitted by Texaco in the agency

---

**18.** See note 14, *supra,* for a discussion of the requested relief.

proceeding is approximately 160,000 pages in length gives some idea of the mass of evidence involved in this case. Again, it is only prudent, when such complex factual issues are involved, to allow the agency to make the initial determination.

Not only is the agency more experienced in making the particular findings necessary in this case, it has already taken substantial steps in that direction. For this Court to begin such proceedings now, after five years of litigation at DOE, would not be the most efficient use of judicial resources.[19]

As the Supreme Court noted in *Far East Conf. v. United States*, "[u]niformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort ... to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure." 342 U.S. at 574–75. In this situation involving both a complex set of regulations and a vast amount of evidentiary data, it is best to defer to the agency for an initial determination. Such deference is not an abdication of this Court's responsibility but a prudent gesture to allow the Court the benefit of the agency expertise.

For the foregoing reasons, DOE's motion to stay on the grounds of primary jurisdiction is granted. DOE's motion to dismiss is denied at the present time; however, such motion may be renewed at the close of the agency proceeding.

## APPENDIX A

19. Texaco argues that this court should consider the length of the administrative proceeding and the fact that, after the OHA proceeding is completed, there is a possibility that the action may be appealed to FERC. Although the lengthiness of an administrative proceeding is one consideration in determining whether primary jurisdiction should apply, *Rohr Industries v. Wash. Metro. Area Transit Auth.*, 720 F.2d 1319 (D.C.Cir. 1983), it is not conclusive. In the present case, the length of the agency proceeding may not be so much a symbol of the inefficiency of the agency but of the complexity of the factual and legal issues.